Michael P. **BARRY**, Appellant,

v.

Donald **JACKSON** and Karen **Jackson**, Appellees.

No. 03–08–00549–CV.

Court of Appeals of Texas, Austin.

March 19, 2010.

Brandon W. Beasley, Irion & Slade, Austin, for appellant.

John G. Lione, Jr., Lione & Lee, P.C., Austin, for appellee.

Before Justices PATTERSON, PURYEAR and PEMBERTON.

## ON MOTION FOR REHEARING

DAVID PURYEAR, Justice.

Our opinion, concurring and dissenting opinion, and judgment dated January 15, 2010, are withdrawn, and this opinion, concurring and dissenting opinion and judg-

ment are substituted in their place. We overrule the appellees' motion for rehearing.

In mid–July 2002, appellant Michael P. Barry entered into a contract with appellees Donald and Karen Jackson under which he agreed to buy their home for $370,000. The Jacksons then signed a contract to buy another house. Shortly after the Jacksons' option period on their new house expired, Barry informed the Jacksons that he would not be going through with the purchase. The Jacksons lost the earnest money they had deposited in conjunction with the contract for their new house, as well as an option-period fee and a fee to have the new house inspected. The Jacksons re-listed their house after doing a number of repairs, eventually selling it in late October 2003 for $339,000. The Jacksons sued Barry for breach of contract. Following a bench trial, the trial court entered judgment in favor of the Jacksons, awarding them breach-of-contract damages in the amount of $46,965, $3,889 for "out of pocket" damages, and $23,165 in attorney's fees. Barry appeals, complaining that the trial court erred because (1) the Jacksons sought to be awarded Barry's earnest money, thus electing a contractual remedy that bars them from receiving damages; (2) there was insufficient evidence of the property's market value to support the trial court's award of damages; and (3) because the damages were improper, the attorney's fees award should be reversed. We will reverse the trial court's judgment, render judgment awarding the Jacksons $3,889 in damages, and remand the cause to the trial court for reconsideration of the issue of attorney's fees.

**Summary of the testimony**

In July 2002, Barry, acting through his realtor,[1] approached the Jacksons about buying their home, which at the time was not listed for sale. On July 13, after some negotiations, the parties signed a contract under which Barry would buy the Jacksons' house for $370,000. The contract provided that Barry could cancel within seven days after receiving a seller's disclosure notice from the Jacksons; the disclosure was provided on July 15, 2002, giving Barry until July 22 to terminate the contract. Barry placed $3,000 in escrow on July 16. After signing the contract with Barry, the Jacksons started looking for a new house, and on July 17, they signed a contract to buy a house on Pebble Garden Court, placing $3,000 in escrow, paying the sellers $500 for the unrestricted right to cancel the contract within seven days, and paying $389 for an inspection.

On July 23, Barry had the Jacksons' property inspected. The inspector found about twenty issues, including wood rot in a door frame, a rotten wiring conduit under the deck, a broken handle on the built-in microwave, a leak in the kitchen faucet, and some problems with the pool. Mr. Jackson testified that he and his wife had only known that the microwave needed a new handle. That night, Barry met with the Jacksons to discuss the inspection report. Mr. Jackson testified that during the meeting, Barry said he thought the agreed price was too high and that the Jacksons would be "making too much profit." The next day, however, the parties' realtor called to say Barry "was going to proceed to buy [their] house," so the Jacksons let the option period run on the Pebble Garden house, intending to close that contract the same day they closed with Barry on their house. On July 25, one day

1. The same realtor represented both Barry and the Jacksons in preparing the contract.

In 2003, the Jacksons used a different realtor to re-list and eventually sell the property.

after the Jacksons' option period expired, Barry called to tell the Jacksons that he was not going to buy the house. The Jacksons were forced to cancel their contract on the Pebble Garden house, losing their escrow money, option-period fee, and inspection fee.

After Barry backed out of the contract, the Jacksons put their house back on the market, listing it for sale by owner for $369,900 until mid-November 2002, at which time they discovered their dishwasher was leaking. They took the house off the market, replaced the dishwasher, and removed the hardwood flooring in the kitchen, replacing it with tile. They put the house back on the market in late May 2003, first listing it for sale by owner, and then contracting with a different realtor to list the house in July 2003. In late September 2003, they contracted to sell the house for $339,000; the contract closed in late October 2003.[2] The Jacksons' realtor at the time of the sale testified that $339,000 was "probably pretty close" to the property's fair market value at the time the sale closed. The Jacksons sued Barry, seeking to recover damages for his breach.[3] In their amended petition, the Jacksons sought the following damages that they alleged were the result of Barry's breach: lost earnest money, option money, and inspection fees on the Pebble Garden house; $31,000 for the difference in the contract prices; and various consequential damages as a result of Barry not closing his contract as agreed. The Jacksons did not seek Barry's $3,000 in earnest money as an alternative remedy.

In a letter to the parties after the bench trial, the trial court stated that it was ruling in favor of the Jacksons, acknowledging that the proper measure of damages was the difference between the contract price and the market value of the property on the date of the breach.[4] The court also observed that "the market value is *fixed* by the actual resale price if it is a fair resale (open market) within a reasonable time after the breach." The court concluded that because the house was listed for a number of months at the original $370,000 contract price but that no offers were made until the final sale for $339,000, "the best evidence of the market value on the date of the breach is the resale price." The court stated, "The difference between the contract price and the resale price is $46,965. This is a windfall profit for the Jacksons, but, under the law, it is the benefit of their bargain with Mr. Barry," concluding that the Jacksons should recover $46,965,[5] plus $3,889 for out-of-pocket

2. The Jacksons assert that under the later contract, they were obligated to pay $9,000 in closing costs and a $465 residential service policy, neither of which was required by the contract with Barry, and about $2,000 for repairs done at the buyers' request. The Jacksons further asserted that when they eventually sold the house, they had to include a trampoline, pool equipment, barstools, the refrigerator, and window treatments. However, we note that the Barry contract includes pool equipment and window treatments except for "curtains/valances" in six rooms.

3. The Jacksons initially sued only their realtor and her brokerage company, filing suit in March 2003. They amended their suit in May 2003 to add Barry as a defendant. The Jacksons settled their claims against their realtor and her brokerage company for $17,000.

4. We recognize that the court's letter to the parties is not a finding of fact, *Cherokee Water Co. v. Gregg County Appraisal Dist.*, 801 S.W.2d 872, 878 (Tex.1990), but we believe it is nonetheless instructive background regarding the court's reasoning in calculating the Jacksons' damages.

5. Presumably, the $46,965 award is the $31,000 difference in the contract prices, plus $15,965, which apparently includes repairs made during the year the Jacksons continued to own and live in the house, additional clos-

damages and $24,590 in attorney's fees. The court later entered findings of fact and conclusions of law finding that the parties contracted for Barry to buy the Jacksons' house for $370,000; that the Jacksons paid $3,500 in earnest money and $389 in inspection fees for the Pebble Garden house and then lost the earnest money when they were forced to default on the contract; that the Jacksons eventually sold their house for $339,000 and that the contract required them to pay $15,965 more than did their contract with Barry. The court concluded that the Jacksons had incurred $46,965 in actual damages, $3,889 in additional out-of-pocket damages, and $23,165 in reasonable and necessary attorney's fees.

## Discussion

On appeal, Barry contends that (1) the Jacksons elected a contractual remedy that bars them from receiving damages, (2) there was insufficient evidence of the property's market value to support the trial court's damages award, and (3) because the damages award was improper, the award of attorney's fees should be reversed. Because we agree that the evidence is legally insufficient to establish the market value of the Jacksons' property at the time of Barry's breach, we hold that the Jacksons failed to prove that they were entitled to the $46,965 awarded by the trial court.[6]

We review a trial court's factual determinations after a bench trial for legal and factual sufficiency, using the same standards applied to jury verdicts. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996). A challenge to the legal sufficiency will be sustained if there is a complete absence of evidence of an essential fact, the trial court was barred by rules of law or evidence from giving weight to the only evidence proving an essential fact, no more than a scintilla of evidence was offered to prove an essential fact, or the evidence conclusively establishes the opposite of the essential fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). We view the evidence in the light most favorable to the trial court's determination, crediting favorable evidence if a reasonable fact finder could have done so and disregarding contrary evidence unless a reasonable fact finder could not. *Id.* at 807. The trial court as fact finder is the sole judge of the witnesses' credibility and the weight to be given their testimony, and we will not disturb the court's resolution of evidentiary conflicts that turn on credibility determinations or the weight of the evidence. *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.,* 974 S.W.2d 906, 914 (Tex.App.-Austin 1998, pet. denied); *see City of Keller,* 168 S.W.3d at 819.

■ Initially, we disagree with Barry that the Jacksons elected to receive the earnest money that was on deposit with the court and therefore were barred from seeking damages for breach of contract. Although the Jacksons filed a motion for summary judgment seeking the release of Barry's earnest money, that was sought and granted by the trial court in partial

---

ing costs they paid under the new contract, and increased real estate commissions. It is unclear what the nearly $16,000 is for, however, because the trial court's findings of fact stated only that the October 2003 contract required the Jacksons "to pay $15,965 more than the Barry contract." The court did not provide further explanation, despite Barry's request for additional findings and conclu-

sions, which was related to market value and the measure of damages. Barry did not specifically note a lack of information about the details of the $15,965 award.

6. Because we conclude that the evidence is legally insufficient to support the trial court's damages award, we need not address whether the evidence was also factually insufficient.

satisfaction of the breach-of-contract damages they sought. Shortly after Barry announced his intention to breach his contract, the Jacksons refused to sign a form that would have given them the earnest money and released Barry from further liability. In their amended petition, the Barrys were very clear in seeking damages for breach of contract, which their contract with Barry allowed.[7] There is sufficient evidence to show that the Jacksons did not elect to receive liquidated damages, relinquish their right to sue, or engage in conduct inconsistent with that right. *See Martin v. Birenbaum*, 193 S.W.3d 677, 683–84 (Tex.App.-Dallas 2006, pet. denied). We overrule Barry's complaints related to the Jacksons' purported election of remedies.

We next turn to Barry's complaint related to the evidence supporting the trial court's damages award. Barry argues that the Jacksons did not present sufficient evidence to show the property's market value at the time of his breach. In their brief, the Jacksons state, "At the time of the breach, the market value was the contract price between Barry and the

Jacksons of $370,000.00." They assert that $339,000 was the fair market value "[u]pon resale," and that they are entitled to the $31,000 difference, plus damages for repairs during the year they lived in the house after Barry breached the contract and additional closing costs that they were required to pay under the later, completed contract. We disagree.

The general rule in a breach-of-contract case is that damages should put the plaintiff in the same economic position he would have been in had the contract been performed. *See American Nat'l Petroleum Co. v. Transcontinental Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990). When the breached contract is for real estate, the measure of damages is the difference between the contract price and the property's market value at the time of the breach. *Kempner v. Heidenheimer*, 65 Tex. 587, 591 (1886); *Smith v. Herco, Inc.*, 900 S.W.2d 852, 861 (Tex.App.-Corpus Christi 1995, writ denied); *Ryan Mortgage Investors v. Fleming–Wood*, 650 S.W.2d 928, 935 (Tex.App.-Fort Worth 1983, writ ref'd n.r.e.).[8] The market value of the

---

7. The contract provided that if Barry breached, the Jacksons could seek specific performance and "*other relief as may be provided by law*," or could terminate the contract and "*receive the earnest money as liquidated damages*," in which case the parties were released from the contract.

8. The Jacksons note that *Kempner v. Heidenheimer*, 65 Tex. 587 (1886), was decided 120 years ago and assert that applying the *Kempner* measure of damages is problematic in the current real estate market, in which closings often occur within thirty days of a contract being made, arguing that "*a Court would never find damages since the contract is an indicator of market value, and there would very rarely be any factors that would change the value in a short period of time.*" However, the *Kempner* rule was announced by the Texas Supreme Court, has not been disavowed, and has been applied consistently since its pronouncement. *See, e.g., Telfener*

*v. Russ*, 145 U.S. 522, 534, 12 S.Ct. 930, 36 L.Ed. 800 (1892) ("The measure of damages for breach of a contract of sale of land by the purchaser is the difference between the contract price and the salable value of the property. That is the rule laid down by the Supreme Court of Texas in *Kempner v. Heidenheimer*, 65 Tex. 587."); *Kollmeyer v. Stewart*, No. 05–00–01787–CV, 2001 WL 1570322, at *3, 2001 Tex.App. LEXIS 8194, at *10 (Tex.App.-Dallas Dec.11, 2001, no pet.) (not designated for publication); *Ozlat v. Nhan Van Hua*, No. 01–97–00568–CV, 1998 WL 255142, at *3–4, 1998 Tex.App. LEXIS 3020, at *8 (Tex.App.-Houston [1st Dist.] May 21, 1998, no pet.) (not designated for publication); *Tindall v. Ledford*, No. 07–96–00400–CV, 1998 WL 78297, at *8, 1998 Tex.App. LEXIS 1180, at *20 (Tex.App.-Amarillo Feb. 25, 1998, pet. denied) (not designated for publication); *Smith v. Herco, Inc.*, 900 S.W.2d 852, 861 (Tex.App.-Corpus Christi 1995, writ denied); *Johnson v. Price*,

property may be determined by "a fair resale, after notice to the party,... *within a reasonable time after the breach.*" *Kempner*, 65 Tex. at 591 (emphasis added).

■ The Jacksons sold their house in October 2003, more than a year after Barry breached the contract. Although we recognize that "[w]hat is a reasonable time is a question of fact, varied by the circumstances of each case," *id.*, the Jacksons provided no evidence related to whether thirteen months was a reasonable time, especially considering that they took the house off the market for a number of months and had the property listed for sale by owner, rather than through a realtor who could list it in the MLS system, for a time. For example, they did not present testimony by an appraiser or realtor as to whether the real estate market had undergone significant fluctuations during that year, that the eventual sales price would have been a fair market value for the property at the time of the breach, or whether market conditions in October 2003 were similar to those in August 2002.

Recent events in the nationwide real estate market show without a doubt that one year can make an enormous difference in the value of real estate, and Texas courts have recognized this fact. *See id.* (period of time that "would give room for fluctuations in the market in the [usual] order of things ... would be unreasonable"); *Chiu Moon Chan v. Montebello Dev. Co.*, No. 14–06–00936–CV, 2008 WL 2986379, at *3–4, 2008 Tex.App. LEXIS 5980, at *11 (Tex. App.-Houston [14th Dist.] July 31, 2008, pet. denied) (mem. op.) (quoting *Naylor v. Siegler*, 613 S.W.2d 546, 547 (Tex.Civ. App.-Fort Worth 1981, no writ)) (" '[r]eal property has a fluctuating value' and '[t]here is no way to ascertain at any given time what the value of a particular tract of real property might be in the future' "). As plaintiffs, it was the Jacksons' burden to establish the property's market value as of August 2002, not October 2003, and thus it was their burden to establish that the later sale was within a reasonable amount of time.[9] *See Kempner*, 65 Tex. at 592; *see also Barraza v. Koliba*, 933

No. 14–84–00656–CV, 1985 Tex.App. LEXIS 7394, at *2–3 (Tex.App.-Houston [14th Dist.] Jan. 24, 1985, no writ) (not designated for publication); *Roselawn Cemetery, Inc. v. Martin*, 415 S.W.2d 442, 445 (Tex.Civ.App.-San Antonio 1967, no writ). When a buyer defaults, the seller may seek specific performance, *see* Restatement (Second) of Contracts § 360 cmt. e (1981) ("seller who has not yet conveyed is generally granted specific performance on breach by the buyer" because "it may be difficult for him to prove with reasonable certainty the difference between the contract price and the market price of the land"), or usually receives any earnest money and retains the value of the use and ownership of the property.

9. In *Kempner*, the supreme court held that the trial court did not err in refusing to use the price obtained for property in a private sale seven months after the breach. 65 Tex. at 591–92. In *Kollmeyer*, the court held that a price from a resale four months after the

breach was some evidence showing market value, apparently assuming but not discussing whether this was a reasonable time. 2001 WL 1570322, at *4, 2001 Tex.App. LEXIS 8194, at *12. In *Ozlat*, a sale nine days after the breach was sufficient evidence of the property's market value. 1998 WL 255142, at *4, 1998 Tex.App. LEXIS 3020, at *9. In *Corpus Christi Development Corp. v. Carlton*, on the other hand, the court held that testimony about the property's value at the time of trial, seventeen months after the breach, was no evidence of the property's value at the time of the breach. 644 S.W.2d 521, 522 (Tex. App.-Corpus Christi 1982, no writ). Similarly, in *Barraza v. Koliba*, because "[t]he only evidence arguably admitted on this issue [of market value] again came in through the Barrazas, whose testimony was limited to the market value of the land *as of the date of trial*," there was no evidence of the property's market value at the time of the contract. 933 S.W.2d 164, 169–70 (Tex.App.-San Antonio 1996, writ denied).

S.W.2d 164, 170 (Tex.App.-San Antonio 1996, writ denied) (only evidence of market value was buyer's testimony about property's value at time of trial six years later; "[a]ccordingly, the Barrazas have failed to establish this component of their damages"); *Smith*, 900 S.W.2d at 860 (plaintiff called appraiser to testify as to value of property as represented and actual value of property at time of breach). Because the Jacksons did not present any evidence that would support reasonable inferences either that the October 2003 sale occurred within a "reasonable time" or that the October 2003 sales price reflected the property's value at the time of Barry's breach more than a year earlier, the trial court erred in awarding them the difference between the two contract prices.

As for the remaining breach-of-contract damages, the trial court found that the terms of the October 2003 contract required the Jacksons "to pay $15,965 more than the Barry contract." Thus, the additional damages are related to the difference in market value between the Barry contract and the October 2003 contract. In other words, the October 2003 contract not only provided a contract price $31,000 lower than did the Barry contract, it apparently burdened the Jacksons with nearly $16,000 in less favorable contractual terms. Because we have held that the evidence is legally insufficient to support findings that the October 2003 contract was within a reasonable time or reflected the property's value at the time of the breach, the evidence is likewise insufficient to support the trial court's award of nearly $16,000 that was subsumed into the later contract's terms.

■ The Jacksons did, however, establish that they were entitled to recover the earnest money they lost when they had to break their contract for the house on Pebble Garden Court, as well as the option fee and inspection costs. Although Barry insists that the full measure of damages should be limited only to the difference in market value and contract price, the Jacksons presented ample evidence that they entered into the Pebble Garden contract due to Barry's signing of the contract and that they were forced to break the contract, losing $3,889 in inspection fees, option fees, and earnest money, when Barry informed them that he was breaching his contract too late for them to cancel the Pebble Garden contract without penalty. *See Mood v. Kronos Prods., Inc.,* 245 S.W.3d 8, 12 (Tex.App.-Dallas 2007, pet. denied) ("measure of damages for breach of contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed" and may include foreseeable consequential damages that can be traced to breach).[10]

We reverse the trial court's judgment and render judgment that the Jacksons are entitled to recover $3,889 in damages for Barry's breach of contract. Because we have significantly recalculated the damages award, we remand the cause to the trial court for recalculation of attorney's fees. *See Young v. Qualls,* 223 S.W.3d 312, 314–15 (Tex.2007) (quoting *Barker v. Eckman,* 213 S.W.3d 306, 314 (Tex.2006)) (holding that issue of attorney's fees should be retried if damages awarded are reduced on appeal and appellate court can-

10. Barry argues that the measure of damages following a breach of a real estate contract are limited solely to the difference in contract price and market value at the time of breach, citing *Kempner,* 65 Tex. at 591. That measure, however, explains how courts should de-termine basic damages for breach of a real-estate contract. It does not bar litigants from seeking foreseeable consequential damages that can be traced to the breach. *See Mood v. Kronos Prods., Inc.,* 245 S.W.3d 8, 12 (Tex. App.-Dallas 2007, pet. denied).

not be reasonably certain that trial court was not influenced by erroneous damages award); *see also Bossier Chrysler–Dodge II, Inc. v. Rauschenberg,* 238 S.W.3d 376, 376 (Tex.2007) (quoting *Barker,* 213 S.W.3d at 314) (remanding issue of attorney's fees to trial court for recalculation after damage award was significantly reduced); *Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex. 1997) (providing factors to consider in calculating contingent attorney's fees).

Concurring and Dissenting opinion by Justice PATTERSON.

JAN P. PATTERSON, Justice, concurring and dissenting.

The concurring and dissenting opinion dated January 15, 2010, is withdrawn, and this opinion is substituted in its place.

Reversing in part the district court's award of damages against appellant Michael P. Barry for breach of a residential real estate contract following a bench trial, the majority misapplies the law upon which it relies, *see Kempner v. Heidenheimer,* 65 Tex. 587, 591 (1886), as well as our standard of review by substituting itself as the fact finder. *See Golden Eagle Archery, Inc. v. Jackson,* 116 S.W.3d 757, 761 (Tex.2003). Because I would overrule Barry's points of error and affirm the judgment of the district court, I concur in the majority's opinion to the extent it affirms the district court's award of damages but dissent to the remainder of the majority's opinion.

I begin by reviewing the background of the parties' dispute and then discuss each of Barry's points on appeal.

## BACKGROUND

In July 2002, Barry, through his real estate agent Lisa Kennedy, approached the Jacksons about purchasing their residence located at 10713 Redmond in Austin, Texas. At the time, the Jacksons' residence was not on the market. After Barry was shown the residence, the parties negotiated and agreed to a purchase price of $370,000. On July 13, 2002, the parties entered into a contract in which Barry agreed to purchase the Jacksons' property for the agreed purchase price (the "residential contract"). The residential contract required (i) Barry to deposit $3,000 in earnest money; (ii) the Jacksons to provide a seller disclosure notice to Barry, but not to make any repairs to the residence prior to closing; and (iii) a closing date of August 12, 2002. Barry also had the right to have the Jacksons' residence inspected and to terminate the contract "for any reason within 7 days" after Barry received the Jacksons' disclosure notice.

After entering into the contract with Barry and with Kennedy's assistance, the Jacksons began searching for a residence to purchase. On July 17, 2002, the Jacksons entered into a contract to purchase a residence located on Pebble Garden Court (the "Pebble Garden contract"), depositing $3,000 earnest money and paying an option fee of $500 "for the unrestricted right to terminate this contract by giving notice of termination to Seller within 7 days after the effective date of this contract." The Pebble Garden contract also provided a closing date of August 12, 2002.

Pursuant to the terms of the residential contract, Barry deposited earnest money of $3,000 with the title company, the Jacksons provided a seller disclosure notice dated July 15, 2002, and the Jacksons' residence and the Pebble Garden residence were inspected by the same company on July 23, 2002. The inspection report for the Jacksons' residence included repair items not included on the seller disclosure notice. On or about July 25, 2002, Barry notified the Jacksons that he was not go-

ing to purchase their residence.[1] It was undisputed that he was financially able but decided against the purchase. The Jacksons thereafter cancelled the Pebble Garden contract, losing their earnest money deposit and option fee. On August 6, 2002, Barry entered into a contract to purchase a different residence in the same neighborhood for $415,000 and closed on the other residence on August 26, 2002.

After Barry failed to purchase their residence, the Jacksons put their residence on the market at the list price of $370,000 until November of 2002. In November, they discovered a leak that required repair and took their residence off the market to have the leak repaired. Their final payment on the repairs was in March 2003. They then put their residence back on the market at the end of May 2003, listed the residence with Keller Williams in July 2003, and sold it in September 2003 for $339,000. Pursuant to the terms of the subsequent contract to sell their residence (the "subsequent contract"), the Jacksons incurred costs that they would not have incurred had Barry purchased their residence, including additional closing costs of $9,000 and repair costs to their residence. They also agreed to convey certain items as part of the sale, such as their refrigerator, that they were not required to convey to Barry pursuant to the residential contract.

The Jacksons filed suit against Barry in May 2003, seeking damages for breach of the residential contract.[2] The Jacksons obtained a summary judgment in 2004 and were awarded damages plus the release of the earnest money of $3,000 that Barry had deposited with the title company.[3] Based on the district court's order, the title company released the earnest money to the Jacksons. Barry thereafter filed a motion for new trial, asserting that he did not receive notice of the summary judgment hearing. The district court granted Barry's motion, and the Jacksons deposited the earnest money that they had received from the title company into the registry of the court.

The case was tried to the court in May 2008. Barry's defenses included material misrepresentation, failure to disclose, and election of remedies. Barry testified concerning his communications and negotiations with the Jacksons, his reasons for not closing the transaction to purchase the Jacksons' residence, and his purchase of a different residence in the same neighborhood. He testified that he planned to purchase the Jacksons' residence until he discovered that the Jacksons had misrepresented and failed to disclose material defects in the residence's condition and the nature, safety, and distance of the walk to the elementary school.

The Jacksons both testified as to their communications and negotiations with Bar-

---

1. The date that Barry notified the Jacksons that he was not going to purchase their residence and his reasons for doing so were disputed at trial. Barry testified that he notified the Jacksons on July 23, 2002, that he was not going to buy their house. Even according to Barry's testimony, then, Barry did not notify the Jacksons of his intent to terminate within the seven-day termination period that began to run on July 15.

2. The Jacksons initially brought suit in March 2003 against the real estate broker Lisa Kennedy and Coldwell Banker–Richard Smith

Realtors. They added Barry as a defendant in May 2003. At the time of trial, the Jacksons had dismissed the other defendants after reaching a settlement with them.

3. The district court awarded the sum of $62,557, plus damages for failing to attend a mediation in the amount of $1,500, attorney's fees in the amount of $3,775, all costs of court, and the release to the Jacksons of the $3,000 earnest money deposited with the title company.

ry. They testified that they did not misrepresent to Barry the nature of the walk to the elementary school or have prior knowledge of the repair items identified in the inspection report. They also testified concerning a meeting that occurred between the Jacksons, Barry, and Kennedy on July 23, the day of the inspections.

At the meeting, Mr. Jackson testified that Barry told them that he thought the agreed price was too expensive and that the Jacksons advised Barry that they needed to know by the following day because of the option they had on the Pebble Garden contract:

Q. When was the first idea that you had that [Mr. Barry] might not close on [your house]?

A. July 23.

Q. What occurred on July 23?

A. July 23 was the day of the two inspections. . . .

Q. At some point did Mr. Barry show up at your house?

A. About 4:30 that afternoon. . . . We sat down at the dinner table once again. Mr. Barry, myself, Karen, my wife, Lisa Kennedy, realtor, and sort of briefly went through the inspection. Mr. Barry indicated at that time he couldn't buy our house because he found out how much we paid for it when we purchased it previously four, five years ago. He also mentioned that he had five kids to feed, he lost 40% of his investments in the stock market prior to July 1st, '01 and he may not be moving—be taking relocation here to Austin.

Q. Did [Mr. Barry] indicate to you that your house was too expensive?

A. He did say it was too expensive. He said—found out what we had paid initially when we first bought it

and that we were making too much profit.

Q. Okay. How did that conversation end?

A. We told Mr. Barry at that point we had an option on the Pebble Garden home and we need to know the following day. He said he had to go back and talk to his wife. He would get back in touch with Lisa Kennedy and let her know his plans to either purchase the home or not. . . .

Mr. Jackson testified that he did not hear anything further until after the option period had expired on the Pebble Garden contract. Mrs. Jackson also testified concerning the reasons that Barry told them that he was considering not purchasing the Jacksons' residence:

Q. Okay. Now on July 23 the conversation around the kitchen table, did Mr. Barry indicate to you at that time that he was not going to buy your house?

A. He said he was considering not buying it, I think were his words.

Q. What were the reasons that he gave you for considering not buying your house?

A. That—first of all, he found out that we were going to make too much money off of it because he knew what we paid for it originally and that he had five kids to feed and that he lost money—part of his investments. I want to say it was 40 percent of his investments and that he might not move to Austin.

Mr. Jackson also testified concerning their negotiations and communications surrounding the Pebble Garden contract, their efforts to sell their residence from

August 2002 to September 2003,[4] and their losses incurred from Barry's failure to purchase their residence.

Robert Mohr, the real estate agent who listed and sold the Jacksons' residence in September 2003, testified as an expert and fact witness for the Jacksons. Mohr testified to his efforts to market and sell the residence and opined concerning the residence's market value.

Following the trial, the district court granted judgment in favor of the Jacksons, awarding damages for breach of contract in the amount of $46,965, out-of-pocket damages of $3,889, and attorney's fees of $23,165. The district court also entered findings of fact and conclusions of law. Barry moved for a new trial and requested additional findings of fact and conclusions of law. The district court did not make additional findings or conclusions, and Barry's motion for new trial was overruled by operation of law.

## ANALYSIS

In three points of error, Barry does not challenge the district court's conclusion of law that he breached the residential contract.[5] Barry challenges the damages that the district court awarded to the Jacksons. In his first point of error, Barry contends that there was no evidence or insufficient evidence to support the award of any damages other than the earnest money of $3,000 because the Jacksons requested and received the earnest money in 2004. In his second and third points of error, Barry contends that there was no evidence or insufficient evidence to support the award of actual damages, out-of-pocket damages, nominal damages, or attorney's fees. As part of his second point of error, Barry also complains that the district court erred in overruling his objection to the admission of expert testimony by Mohr on market value. Because I would affirm the judgment of the district court, I address each of Barry's points of error. See Tex.R.App. P. 47.1.[6]

### Election of Remedies

In his first point of error, Barry contends that there was no evidence or insufficient evidence to support the award of

4. Mr. Jackson testified concerning their reasons for taking the residence off the market in the middle of November 2002 and putting it back on the market at the end of May 2003:

    Q. During that period of time did you have the house on the market?

    A. No, we took the residence off the market due to the repairs.

    Q. After the repairs were complete did you put the house back on the market?

    A. We put the house back on the market Memorial Day weekend of '03, as we wanted to finish out the school year before we started looking for homes. And the market was generally fairly slow up until late spring, early summer. So we didn't put the house back on the market until about the end of school, which would be the last week or so of May.

5. The district court's conclusions of law included that Barry breached the residential

contract to purchase the Jacksons' property and that the Jacksons' right to collect damages from Barry was not barred by fraudulent inducement or material misrepresentations.

6. In response to Barry's points of error, I review the evidence for legal and factual sufficiency to support the district court's findings of fact concerning damages. See City of Keller v. Wilson, 168 S.W.3d 802, 810 (Tex.2005) (legal sufficiency standard of review); Ortiz v. Jones, 917 S.W.2d 770, 772 (Tex.1996) (trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict); Cain v. Bain, 709 S.W.2d 175, 176 (Tex.1986) (when considering factual sufficiency challenge, reviewing court considers all of the evidence and "should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust").

any damages other than the earnest money of $3,000 because the Jacksons elected the "alternative, non-mutual contractual" remedy to terminate the residential contract when they requested and received the earnest money in 2004. Barry contends that the receipt of the earnest money precluded the Jacksons from recovering any other damages under the remedies clause of the residential contract. The remedies clause provided that, in the event of Barry's breach, the Jacksons

> may (a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract.

Barry relies on the affirmative defense of election of remedies. The election doctrine may bar relief when one successfully exercises an informed choice between two or more inconsistent remedies, rights, or state of facts as to constitute manifest injustice. *See Medina v. Herrera*, 927 S.W.2d 597, 600 (Tex.1996) ("[A]n election will bar recovery when the inconsistency in the assertion of a remedy, right, or state of facts is so unconscionable, dishonest, contrary to fair dealing, or so stultifies the legal process or trifles with justice or the courts as to be manifestly unjust." (quoting *Bocanegra v. Aetna Life Ins. Co.*, 605 S.W.2d 848, 851 (Tex.1980))); *see also Aguiar v. Segal*, 167 S.W.3d 443, 455–56 (Tex.App.-Houston [14th Dist.] 2005, pet. denied) (court held that sellers entitled to earnest money as liquidated damages under remedies clause in real estate contract based on buyers' breach and sellers' election to terminate).

Although the express terms of the remedies clause allowed the Jacksons to elect to terminate the residential contract in the event of Barry's breach and receive the earnest money as liquidated damages, the Jacksons' pleadings and evidence at trial demonstrated that they did not elect to terminate the contract and limit their damages to the earnest money, but to seek "such other relief as may be provided by law." Mr. Jackson testified at trial that, when Lisa Kennedy requested the Jacksons to sign a "release of earnest money" in July 2002, they refused to do so.[7] Consistent with their refusal to sign the release, the Jacksons brought suit against Barry in 2003, seeking monetary damages based on his breach of the residential contract.

Further, the record shows that the Jacksons received the earnest money from the title company during the pendency of this suit based upon the district court's order that granted their motion for summary judgment and awarded them monetary damages against Barry. After the district court granted Barry's motion for new trial and set aside the summary judgment order, the Jacksons deposited the earnest money that was released to them from the title company into the registry of the court. The Jacksons' temporary receipt of the earnest money stemming from the district court's order is not inconsistent with their election to seek monetary damages under the contractual remedies clause and does not support limiting their recovery to the earnest money based on the election of remedies defense. *See Medina*, 927 S.W.2d at 600.

**7.** The form "Release of Earnest Money" that was sent to the Jacksons for signature in July 2002 was admitted as an exhibit. The form reflects that Barry signed it on July 28, 2002, and Kennedy signed it on July 27, 2002. The form "provides for the release of the parties, brokers, and title companies from all liability under the contract (not just for disbursement of earnest money)." Neither Mr. or Mrs. Jackson signed the form.

I would conclude that the evidence was legally and factually sufficient to support a finding that the amount of monetary damages from the breach was not limited to the amount of earnest money. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (legal sufficiency standard of review); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (factual sufficiency standard of review); *see also Martin v. Birenbaum*, 193 S.W.3d 677, 683–84 (Tex.App.-Dallas 2006, pet. denied) (although seller acted to prevent return of earnest money to buyer after buyer breached contract to purchase seller's residence, evidence sufficient that intended to sue rather than accept liquidated damages; evidence did not conclusively establish buyer's election defense).

I therefore concur with the majority's decision to overrule Barry's complaints related to the Jacksons' purported election of remedies.

### Sufficiency of Evidence of Damages

In his second point of error, Barry challenges the sufficiency of the evidence to support the district court's awards of actual damages and out-of-pocket damages. As part of his second point of error, he also challenges the admission of Mohr's expert testimony on market value. In his third point of error, Barry challenges the sufficiency of the evidence to support the award of attorney's fees. I begin by addressing the admission of Mohr's expert testimony and then address each of the challenged awards.

#### 1. Expert Testimony of Market Value

Barry contends that the district court erred in allowing Mohr to testify as an expert concerning the market value of the Jacksons' residence. Barry urges that the Jacksons' responses to Barry's request for disclosure and interrogatories were inadequate because they only disclosed that Mohr would testify to market value and did not provide "the general substance" of

Mohr's "mental impressions and opinions and a brief summary of the basis for them." *See* Tex.R. Civ. P. 194.2(f)(3).

Challenges to the admission of expert witness testimony are reviewed under an abuse of discretion standard. *Larson v. Downing*, 197 S.W.3d 303, 304–05 (Tex. 2006); *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex.2001). A trial court abuses its discretion when it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985).

The Jacksons' responses to Barry's discovery requests are not in the record, and it was Barry's burden "to see that a sufficient record [was] presented to show error requiring reversal." *See Christiansen v. Prezelski*, 782 S.W.2d 842, 843 (Tex.1990). Further, during the exchange with the district court concerning Barry's objection, counsel for Barry represented that the Jacksons designated Mohr as an expert in 2005 and disclosed that he would testify on "market value" and that Barry had not objected to the adequacy of Jacksons' discovery responses prior to the bench trial or attempted at any time to depose Mohr. Barry's counsel also agreed with the district court that "all" the Jacksons did not disclose was "his actual opinion as to the market value." The district court explained its ruling to admit Mohr's testimony on market value:

> Well, if you had no indication that he was going to testify as to the subject matter then certainly you would be surprised now. But since 2005 it was clear that he was designated as an expert on the market and market value of the property. And it seems to me sort of unfair at this point to say, but he didn't put in the actual number that he was going to testify to. So I'll allow him to testify.

On this record, I would conclude the district court did not abuse its discretion when it allowed Mohr to testify concerning the market value of the Jacksons' residence. *See Larson,* 197 S.W.3d at 304–05; *Downer,* 701 S.W.2d at 241–42; *see also* Tex.R. Civ. P. 193.6(a)(2) (evidence not properly disclosed may be admitted if the court finds other party will not be unfairly surprised).

### 2. Actual Damages

Barry contends the Jacksons failed to carry their burden of proving any damages based on breach of contract because evidence of the market value of the Jacksons' residence at the time of the breach was necessary to support an award of actual damages and the Jacksons failed to produce any such evidence. As to the subsequent sale of the Jacksons' residence in 2003, Barry argues that he is not bound by the subsequent sale price as a component of the measure of damages because the Jacksons failed to notify him of the pending sale and there was no evidence that the resale was within a reasonable time after the breach and, in any event, the applicable measure of damages does not include recovery for the extra costs that the Jacksons incurred in the subsequent sale. Reversing the district court's award of $46,965 for breach of contract damages, the majority agrees with Barry that evidence of the residence's market value at the time of the breach was essential to recover damages, there was no such evidence, and the Jacksons were not entitled to recover their extra costs from the delay and subsequent sale.

The district court made the following findings of fact and conclusions of law concerning Barry's breach of the residential contract and actual damages from the breach:

### FINDINGS OF FACT

2) On or about July 13, 2002, Defendant Michael Barry entered into a Residential Contract to purchase the Jackson property on Redmond for $370,000.00.

3) The contract by Defendant Barry to purchase the Plaintiffs Jacksons' property provided for a closing date of August 12, 2002.

4) Defendant Barry failed to close and purchase the Plaintiffs Jacksons' property pursuant to the contract by August 12, 2002.

5) Defendant Barry, prior to August 12, 2002, entered into a contract to purchase other property located at 5705 Ballentine Court, Austin, Texas, upon which Barry closed.

\*   \*   \*

9) After Defendant Barry failed to purchase the Plaintiffs Jacksons' property, they placed the property on the market for sale and sold the property for $339,000.00, with contractual terms requiring Plaintiffs Jacksons to pay $15,965 more than the Barry contract.

### CONCLUSIONS OF LAW

1) Defendant Barry breached the Residential Contract to purchase the Plaintiffs Jacksons' property.

2) The damages incurred by the Plaintiffs Jacksons for the breach of the contract include actual damages of $46,965.00.

The findings of fact support the district court's conclusion of law that "damages incurred by the Plaintiffs Jacksons for the breach of the contract include actual damages of $46,965." The amount of $46,965 equals $31,000—the difference between the sale's prices of the residential contract and the subsequent contract—plus $15,965,

the extra costs that the district court found the Jacksons incurred pursuant to the terms of the subsequent contract.

"Generally, the measure of damages for breach of contract is that which restores the injured party to the economic position he would have enjoyed if the contract had been performed." *Mood v. Kronos Prods., Inc.*, 245 S.W.3d 8, 12 (Tex.App.-Dallas 2007, pet. denied). The majority relies upon the measure of damages for the breach of a real estate contract set forth by the supreme court in *Kempner*—the difference between the contract price and the market value at the time of the breach. *See* 65 Tex. at 591; *see also Kollmeyer v. Stewart*, No. 05–00–01787–CV, 2001 WL 1570322, at *3, 2001 Tex.App. LEXIS 8194, *10–11 (Tex.App.-Dallas Dec.21, 2001, no pet.) (mem. op., not designated for publication) (citing *Kempner* measure of damages in context of breach of real estate contract). But, when the purchaser breaches the real estate contract, the market value "may be fixed by a fair resale, after notice to the party, to be bound by the price as the value, within a reasonable time after the breach." *Kempner*, 65 Tex. at 591.[8] The resale price thus fixes the value for determining the seller's damages, and additional evidence of market value at the time of the breach is not necessary. *See id.* This alternative measure of damages comports with the " 'universal rule for measuring damages' " of " 'just compensation for the loss or damage actually sustained.' " *See Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex.1991) (quoting *Stewart v. Basey*, 150 Tex. 666, 245 S.W.2d 484, 485–86 (1952)); *see also Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d

812, 817 (Tex.1997) (types of damages defined and compared).

The supreme court in *Kempner* explained the requirements of "reasonable time" and notice to bind a defaulting purchaser to the resale price:

What is a reasonable time is a question of fact, varied by the circumstances of each case. The lapse of such period as would give room for fluctuations in the market in the usual order of things, or of such as would authorize the inference that the vendor had elected not to adopt this means of fixing the measure of liability, would be unreasonable.... To be bound by the price, the defendant should have notice of the sale. The sale is, in some sense, a sale of his property to pay his debt, and, to protect his interest, he is entitled to notice.

65 Tex. at 591 (internal citation omitted).

On the facts before it, the supreme court concluded that a private resale that occurred seven months after the breach "without advertisement or the use of any professional agency" was not binding on the defendant because "the property was not fairly upon the market." *Id.* The supreme court did not reach the issue of whether the resale was "within a reasonable amount of time." *Id.* Further, although the supreme court did not bind the defendant to the resale price in *Kempner*, the resale price remained evidence of the market value "to be considered by the trial court in connection with the other evidence bearing upon the point." *Id.* In other words, the resale price remained evidence for the fact finder to consider in determining damages. Applying the *Kempner* measure of damages here, the

---

**8.** Without distinction, the majority cites cases addressing a purchaser's measure of damages when a seller breaches a real estate contract and cases addressing a seller's measure of damages when the seller did not resell its property. I would conclude that the measures of damages in those situations are not comparable to the situation here—a purchaser's breach followed by a resale.

price of the Jacksons' subsequent sale "fixed" the market value if the sale was within a reasonable time and with sufficient notice to Barry and, in any event, the price was evidence the fact finder could consider. *See id.*

In reversing the district court's award of breach of contract damages, the majority disregards entirely the evidence favorable to the award of damages, including the Jacksons' efforts to sell their residence after the breach and the subsequent sale price and makes its own fact finding that the subsequent sale was not "within a reasonable time after the breach." *See id.; see also City of Keller,* 168 S.W.3d at 822 (appellate court "must consider evidence in light most favorable to the verdict, and indulge every reasonable inference that would support it"). Weighing the evidence, the majority finds persuasive the fact that the Jacksons listed the property for sale by owner after Barry's breach for a period of time and then took the property off the market for another period of time. The majority also finds that there is no evidence of the condition of the real estate market between the time of the breach and the subsequent resale. The majority focuses on the supreme court's reference in *Kempner* to "fluctuations in

the market" in its discussion of what is a "reasonable time." The majority exceeds its role as an appellate court.

The determination of what is reasonable falls squarely within the province of the fact finder—"what is a reasonable time is a question of fact, varied by the circumstances of each case." *See Kempner,* 65 Tex. at 591; *see also Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996) (trial court's findings of fact are reviewed for legal and factual sufficiency of the evidence by the same standards applied to a jury verdict); *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991) (same). Further, in the context of the supreme court's analysis of "the circumstances" of that case, the reference to "reasonable time" and "market fluctuations" was to the seller's *efforts* to make a fair resale, not the market's actual condition at the time. *See* 65 Tex. at 591 (court discusses plaintiff's efforts to sell property after breach and not the actual market conditions during the period between breach and resale); *cf. Great Am. Ins. Co. v. North Austin Mun. Util. Dist. No. 1,* 908 S.W.2d 415, 426 (Tex.1995) (injured party, following a breach, must exercise reasonable care to minimize his damages if it can be done with slight expense and reasonable effort).[9]

---

9. The other cases the majority cites to support its conclusion that evidence of market conditions was required to show the resale was within a reasonable time do not concern a seller seeking to fix damages for a purchaser's breach by a resale price. *See Chan v. Montebello Dev. Co., L.P.,* No. 14-06-00936-CV, 2008 WL 2986379, at *3–4, 2008 Tex.App. LEXIS 5980, at *11 (Tex.App.–Houston [14th Dist.] July 31, 2008, pet. denied) (mem. op.) (court, addressing validity of liquidated damages clauses in real estate contracts, recognizes that often "impossible to forecast the damages" to seller of real property in the event the purchaser breaches the contract); *Kollmeyer v. Stewart,* No. 05-00-01787-CV, 2001 WL 1570322, at *4, 2001 Tex.App. LEXIS 8194, at *11 (Tex.App.-Dallas 2001, no

pet.) (mem. op., not designated for publication) (seller seeking damages for purchaser's breach without a resale; subsequent offer after breach some evidence of market value at time of breach; no discussion of market conditions); *Barraza v. Koliba,* 933 S.W.2d 164, 169–70 (Tex.App.-San Antonio 1996, writ denied) (breaching party was seller; purchasers contended that paid for land that they thought included mineral rights when, in fact, the land did not; relevant time for determining market value of land without mineral rights was date of the purchase in June 1986 and not date of trial in October 1992); *Smith v. Herco, Inc.,* 900 S.W.2d 852, 861 (Tex.App.-Corpus Christi 1995, writ denied) (breaching party was seller; measure of damages was value of property with and without encroach-

Evidence of the "circumstances" here included Barry's statement to the Jacksons days before breaching the contract that the agreed price of $370,000 was "too expensive," the Jacksons' efforts to sell their residence, and their explanation for the delay between Barry's breach and the subsequent sale. After the breach, the Jacksons' residence was on the market through November 2002 at a price of $370,000. In November, they discovered a leak and took their residence off the market for repairs that were completed in the spring of 2003. Mr. Jackson testified that the "market was generally fairly slow up until late spring, early summer." They again placed their residence on the market in May 2003, listing it in July 2003 with a real estate agency, and ultimately entering into a contract to sell it in September 2003. Mohr, as the Jacksons' real estate agent, testified to his marketing efforts and the successful sale of the Jacksons' residence. He testified that he "listed [the residence] with the MLS, held some open houses, typical things that you would do to try to generate business. Internet ads, that sort of thing." He also testified to the market value of the Jacksons' residence, answering affirmatively when asked if the contract price of $339,000 was "in line with the comparables in the area at the time" and if the contract price was "a representation of what the fair market value would be." Mohr's expert testimony of market value was undisputed.

Improperly substituting itself as the fact finder, the majority disregards this evidence to reach its no-evidence finding.[10] *See City of Keller,* 168 S.W.3d at 810, 822; *Golden Eagle,* 116 S.W.3d at 761; *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 634 (Tex. 1986). Based on this evidence, however, the district court could have concluded that the Jacksons sold their residence for a "fair" price within a "reasonable time" after Barry's breach, and that the delay and subsequent sale price was reflective of the real estate market's condition during that time period. *See Kempner,* 65 Tex. at 591.

The district court also could have found that the evidence of the subsequent sale's notice was sufficient to support the use of the subsequent sale price in determining actual damages. *See id.* In contrast with the resale in *Kempner* that was made "privately" over one hundred years ago when real estate information was not so easily obtainable and disseminated, the Jacksons' subsequent sale was through a real estate agent that publicly listed and marketed their residence, including on the internet. *Id.* Further, even without finding that the subsequent sale price was binding on Barry, the district court could have concluded that (i) the circumstances surrounding the parties' negotiations and agreed sale price, (ii) the Jacksons' continuous efforts to market and sell their residence and the subsequent sale price, (iii) Barry's state-

ment); *Corpus Christi Dev. Corp. v. Carlton,* 644 S.W.2d 521, 522 (Tex.App.-Corpus Christi 1982, no writ) (breaching party was seller; court does not address resale of property but the measure of damages for purchaser as the difference between contract price and market value at time of breach; evidence of market value at time of trial held no evidence of market value at time of breach).

**10.** The majority's holding rewards purchasers who breach real estate contracts by presumably limiting damages in a slow or falling

market: a seller, regardless of its efforts, would only be allowed to recover under the alternative measure of damages using a resale price if the real estate market remained constant. Otherwise, what is the significance of evidence of the actual market condition? Does the majority mean to transfer the risk of fluctuations in the real estate market to the non-breaching party? It would seem to be within common knowledge that, in a slow or falling market, such as the one here, it would take time to sell a residence.

ment prior to his breach that the agreed sale price was "too expensive," and (iv) Mohr's testimony of market value were evidence of the residence's market value at the time of the breach. *See City of Keller,* 168 S.W.3d at 810; *Kempner,* 65 Tex. at 591. I would conclude that the evidence was legally and factually sufficient to support the district court's award of damages for the difference between the contract price and the subsequent sale price. *See City of Keller,* 168 S.W.3d at 810; *Cain,* 709 S.W.2d at 176.

The majority also reverses the award of $15,965 as a component of the actual damages. But Barry does not dispute the district court's finding of fact that the Jacksons actually incurred additional costs of $15,965 in closing the subsequent sale that they would not have incurred under the residential contract. I would conclude that additional costs incurred by the Jacksons as a result of Barry's breach—economic losses that were actually sustained—are recoverable damages for breach of contract. *See Phillips,* 820 S.W.2d at 788; *Mood,* 245 S.W.3d at 12.

### 3. Additional Out–of–Pocket Damages

Similar to his argument concerning the award of additional costs incurred in the subsequent sale, Barry does not dispute that the Jacksons incurred additional out-of-pocket expenses of $3,889 on the Pebble Garden contract but contends that the district court erred in awarding the additional damages because the measure of damages for breach of a real estate contract does not include "expenditures on unrelated property."

The district court made the following findings of fact concerning the Jacksons' additional out-of-pocket damages:

6) After Defendant Barry entered into a contract to purchase the Plaintiffs Jacksons' property, the Jacksons entered into a contract to purchase property located at 6321 Pebble Garden, Austin, Texas.

7) The Plaintiffs Jacksons, pursuant to the contract to purchase Pebble Garden, put down $3,500.00 in earnest money and option money.

8) The Plaintiffs Jacksons also paid $389.00 in inspection fees on the Pebble Garden property.

\*   \*   \*

10) After Defendant Barry failed to purchase the Plaintiffs Jacksons' property, the Jacksons defaulted on their contract to purchase the property at 6321 Pebble Garden and lost the earnest money and option money.

These findings of fact support the district court's conclusion of law that "[t]he additional out-of-pocket damages incurred by the Plaintiffs Jacksons because of Defendant Barry's breach is $3,889.00."

Mr. Jackson testified that they discussed the Pebble Garden contract with Barry after Barry had received the inspection report on their residence and during the period that the Jacksons still had the option to terminate the Pebble Garden contract, but that Barry did not advise them that he was not going to close on their residence until after their option to terminate had expired on the Pebble Garden contract. That the Jacksons would lose their earnest money, option fee, and inspection fee as a result of Barry's breach of the residential contract was known to Barry when he decided not to complete the transaction and to purchase a different residence in the same neighborhood. On this record, the district court could have concluded that these additional damages were foreseeable to Barry and recoverable based on Barry's breach of the residential contract. *See Mood,* 245 S.W.3d at 12 (consequential damages may be recovered when "foreseeable and traceable to the

wrongful act and result from it"); *see also Arthur Andersen*, 945 S.W.2d at 816 (direct and consequential damages defined and compared).

I therefore concur with the majority that the evidence was sufficient to support the district court's award of $3,889 of additional out-of-pocket damages. *See City of Keller*, 168 S.W.3d at 810; *Cain*, 709 S.W.2d at 176.

### 4. Attorney's Fees

The contract between the parties provided that the "prevailing party in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding incurred by the prevailing party." The district court's findings of fact included that the contract between the parties "provided for payment of attorney's fees to the prevailing party in any dispute," and its conclusions of law included that the "[r]easonable and necessary attorney's fees incurred by the Plaintiffs Jacksons total $23,165.00."

Barry contends that the evidence was insufficient to support the award of attorney's fees based on his position that the evidence was insufficient to support the award of any damages. Given that I would affirm the district court's award of damages for Barry's breach of the residential contract, I would conclude that the Jacksons are prevailing parties and contractually entitled to their attorney's fees. *See Intercontinental Group P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 655–56 & n. 27 (Tex.2009) (prevailing party defined to include plaintiff who receives

"affirmative judicial relief"). I would affirm the award of attorney's fees.[11] *See also* Tex. Civ. Prac. & Rem.Code Ann. § 38.001 (West 2008).

For these reasons, I would affirm the district court's judgment.

---

11. Barry alternatively sought remand to the district court for recalculation of attorney's fees if this Court reduced the damages awarded to the Jacksons. Based upon its reduction of damages, the majority remands the issue of attorney's fees to the district court for recalculation. I do not disagree that, in certain circumstances, appellate courts may remand the issue of attorney's fees when the appellate court modifies the amount of damages. *See Young v. Qualls*, 223 S.W.3d 312, 314–15 (Tex.2007). Given that I would uphold the award of damages for Barry's breach of the residential contract, however, I would conclude that remand is not appropriate here.