**AFFIRM in PART, REVERSE in PART, and REMAND; Opinion Filed October 24, 2013.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-12-00146-CV

**MARK GOLDMAN AND CAROLINE GOLDMAN, Appellants**
**V.**
**JEFFREY OLMSTEAD, SUMMER OLMSTEAD, SANDRA HEWETT, AND**
**NRT TEXAS, LLC, Appellees**

**On Appeal from the 298th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. 1001144-M**

### OPINION

Before Justices Bridges, Fillmore, and Lewis
Opinion by Justice Fillmore

Jeffrey and Summer Olmstead sued Mark and Caroline Goldman for breach of a contract to purchase residential real estate. The Goldmans filed a third-party petition against Sandra Hewett, the real estate agent who represented them in the transaction, asserting claims for negligence, breach of fiduciary duty, violations of the Deceptive Trade Practices Act (DTPA), fraud in a real estate transaction, common law fraud, and negligent misrepresentation, and against NRT Texas, L.L.C. (NRT), the broker with whom Hewett was associated, asserting it was liable for Hewett's actions under the doctrine of respondeat superior. Hewett filed a counterclaim against the Goldmans based on fraud.

The trial court rendered judgment in favor of the Olmsteads for damages in the amount of $56,929.85, plus attorney's fees and costs of $151,110.17 and contingent attorney's fees for

appeal. The trial court also rendered judgment that the Goldmans take nothing on their claims against Hewett and NRT and that Hewett take nothing on her fraud claim against the Goldmans. The trial court found that Hewett and NRT were prevailing parties under the terms of the contract and rendered judgment that they recover $150,000 in attorney's fees plus contingent fees for appeal.

In eight issues, the Goldmans assert the trial court erred by: (1) granting the Olmsteads' motion for partial summary judgment on the issue of whether the Goldmans were liable for breach of the contract; (2) denying the Goldmans' competing motion for summary judgment; (3) refusing to enter findings of fact and conclusions of law; (4) granting the Olmsteads' motion for leave to amend their petition in contravention of a rule 11 agreement; (5) awarding carrying costs on the property as damages; (6) allowing expert witnesses to testify when their opinions had not been fully disclosed; (7) awarding the Olmsteads attorney's fees without requiring segregation between recoverable and non-recoverable fees; and (8) awarding Hewett and NRT attorney's fees because they were not prevailing parties under the contract and failed to segregate recoverable and non-recoverable fees. We reverse the trial court's judgment in favor of the Olmsteads, render judgment that the Olmsteads take nothing on their claims against the Goldmans, and remand the issue of the trial court's award of attorney's fees to the Olmsteads. We reverse and remand the issue of the trial court's award of attorney's fees to Hewett and NRT. In all other respects, we affirm the trial court's judgment.

**Background**

In August 2009, the Goldmans requested that Hewett assist them with the purchase of a new home. The Goldmans decided to make an offer to purchase a house at 3813 Stanford that was owned by the Olmsteads (the Stanford house). The Goldmans obtained a prequalification

letter through Bank of America's online process on September 21, 2009 to submit with the offer. The Olmsteads agreed to sell the house to the Goldmans for $810,000.

On September 26, 2009, the Goldmans and the Olmsteads executed a One to Four Family Residential Contract, a form contract prepared by the Texas Real Estate Commission (TREC), for the Goldmans to purchase the Stanford house. The contract provided for a ten-day option period during which the Goldmans could terminate the contract for any reason. It also provided for a thirty-day option period during which the Goldmans could terminate the contract if, after applying for and making every reasonable effort to obtain financing on certain specified terms, the Goldmans were unable to obtain financing for the purchase of the Stanford house. Mark Goldman "immediately" applied for a loan with Randolf Brooks Credit Union. On September 27, 2009, the Olmsteads gave written notice to their tenants to vacate the Stanford house within thirty days.

On October 3, 2009, the Goldmans and the Olmsteads executed an amendment to the contract that required the Olmsteads to pay $1,000 of the Goldmans' closing costs in lieu of making certain repairs to the house. On October 5, 2009, the credit union declined to fund the Goldmans' loan because their income was insufficient for the amount of credit requested and the loan could "over obligate" them. A credit union employee informed Mark Goldman that the loan was declined because the Goldmans planned to continue to own their existing home following the purchase of the Stanford house.

Mark Goldman then applied for a loan from Bank of America. In connection with the application, Mark Goldman provided Bank of America with false information about his employer and his monthly income. On October 13, 2009, the Goldmans' loan officer at Bank of America sent an email to Mark Goldman, with a copy to Hewett and to Sandy Smith, the Olmsteads' real estate agent, stating the underwriter was "requiring a legible, fully executed

–3–

copy of the sales contract" and that the copy of the contract that Bank of America had was "very blurry." The loan officer attached a "clean copy of the sales contract" to the email. On or around October 14, 2009, the Goldmans and the Olmsteads signed a "clean copy" of the contract.

The contract set a closing date of November 4, 2009. On November 4, 2009, the Goldmans and the Olmsteads agreed to amend the contract to extend the closing date to November 18, 2009. On November 9, 2009, Bank of America informed the Goldmans that it was declining to fund the loan because it could not verify Mark Goldman's income. Although Mark Goldman applied for a loan from two other lenders, the Goldmans were not able to obtain financing to purchase the Stanford house. On November 12, 2009, the Goldmans executed a written notice terminating the contract based on their inability to obtain financing.

The Olmsteads sued the Goldmans for breach of contract, requesting specific performance or, alternatively, damages.[1] The Goldmans answered, raising a number of affirmative defenses. The Goldmans also filed a third-party petition against Hewett and NRT, asserting claims against Hewett for negligence, breach of fiduciary duty, violations of the DTPA, fraud in a real estate transaction, common law fraud, and negligent misrepresentation and seeking to hold NRT liable for Hewett's actions under the doctrine of respondeat superior. Hewett asserted a counterclaim against the Goldmans for fraud, alleging Mark Goldman provided false information to Bank of America in order to obtain the prequalification letter.[2]

The Olmsteads filed a motion for partial summary judgment on the issue of whether the Goldmans breached the contract. The Goldmans responded, and filed a competing motion for summary judgment, on grounds they did not breach the contract because the contract was

---

[1] In their first amended petition filed on June 14, 2010, the Olmsteads deleted their request for specific performance of the contract. In their second amended petition filed on April 8, 2011, the Olmsteads added claims based on fraud in a real estate transaction and common law fraud, but abandoned these claims prior to trial. .

[2] In November 2010, the Olmsteads sold the Stanford house to another buyer for $740,000.

unenforceable, void or voidable, or terminated on its own terms, and there had been a novation and the new contract was properly terminated based on the Goldmans' inability to obtain financing. The trial court granted the Olmsteads' motion for partial summary judgment and denied the Goldmans' motion for summary judgment.

The amount of the Olmsteads' damages for the Goldmans' breach of the contract and the claims between the Goldmans and Hewett and NRT were tried to the court. The trial court found the Olmsteads' damages for the breach were $56,929.85. It also determined the Olmsteads were prevailing parties under the contract and awarded the Olmsteads attorney's fees and costs of $151,110.17 plus contingent attorney's fees for appeal. The trial court rendered judgment that the Goldmans take nothing on their claims against Hewett and NRT and that Hewett take nothing on her claim against the Goldmans. The trial court also determined that Hewett and NRT were prevailing parties under the contract and awarded them attorney's fees of $150,000 plus contingent attorney's fees for appeal.

## Summary Judgment

In their first two issues, the Goldmans contend the trial court erred by granting the Olmsteads' motion for partial summary judgment and denying the Goldmans' motion for summary judgment. We review a trial court's decision to grant summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The movant requesting a traditional summary judgment has the burden to demonstrate that no genuine issue of material fact exists and judgment should be rendered as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985). In reviewing a summary judgment, we view all evidence in the light most favorable to the nonmovant. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence

–5–

contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When both parties move for summary judgment and the trial court grants one motion and denies the other, we consider both motions, their evidence, and their issues, and we may render the judgment that the trial court should have rendered. *Id.*

The Goldsteins do not dispute on appeal that the summary judgment evidence established they executed a contract to purchase the Stanford house and failed to close the sale. Rather, they assert the trial erred by granting the Olmsteads' motion for partial summary judgment and denying their motion for summary judgment because (1) the contract fails to identify the sellers and material terms of the contract are otherwise illegible and, therefore, it is indefinite and unenforceable; (2) Smith failed to timely disclose that she is Summer Olmstead's mother and, therefore, the contract is against public policy and void; (3) the Olmsteads timely received notice from Bank of America that it would not approve the Goldmans' loan application and, therefore, the contract terminated on its own terms; and (4) there was a novation of the contract and the new contract was properly terminated based on the Goldmans' inability to obtain financing.

*Indefinite and Illegible*

The Goldmans first argue the contract was indefinite and, therefore, unenforceable because it is illegible and fails to identify the sellers. Whether a contract is too indefinite to be enforced is a question of law. *Fiduciary Fin. Servs. of the Sw., Inc. v. Corilant Fin., L.P.*, 376 S.W.3d 253, 256 (Tex. App.—Dallas 2012, pet. denied).

The elements of a valid and enforceable contract are: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Effel v. McGarry*, 339 S.W.3d 789, 792 (Tex. App.—Dallas 2011, pet. denied). "In

general, a contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *see also T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). If the terms of an alleged contract are so indefinite that it is impossible for the courts to determine the rights and obligations of the parties, it is not an enforceable agreement. *Effel*, 339 S.W.3d at 792; *see also Corilant Fin., L.P.*, 376 S.W.3d at 256. "The rules regarding indefiniteness of material terms of a contract are based on the concept that a party cannot accept an offer so as to form a contract unless the terms of that contract are reasonably certain." *City of Fort Worth*, 22 S.W.3d at 846.

The Goldmans first assert the contract is indefinite because it is illegible. The summary judgment evidence reflects that, on September 26, 2009, the Goldmans and the Olmsteads executed a standard form contract promulgated by the TREC for the sale of the Stanford house to the Goldmans for $810,000. The copy of the September 26, 2009 contract in the record is difficult to read. However, Bank of America provided for signature a "clean copy" of the contract in order to process the Goldmans' loan application for the purchase of the Stanford house. The summary judgment evidence includes a "clean copy" of the contract signed on or around October 14, 2009 by the Goldmans and the Olmsteads for the sale of the Stanford property to the Goldmans for $810,000. Accordingly, the trial court could determine from the summary judgment evidence the essential terms of the contract between the parties, and the contract is not indefinite because it is illegible.

The Goldmans next contend the contract is indefinite and fails for lack of mutuality because the names of the sellers were not included on the first page of the contract. The contract contains a blank on the first page for the names of the sellers. This blank was not completed in either the September 26 or the October 14 copies of the contract. However, both copies of the

contract name Jeff Olmstead as the person to receive notifications for the sellers. The sellers also provided an email address of olmstead.summer@gmail.com. Both Summer Olmstead and Jeffrey Olmstead initialed each page of the contract and signed the contract in the appropriate locations. We conclude the contract identified the sellers sufficiently to bind the Olmsteads and was not indefinite due to a failure to identify the sellers.

The Goldmans finally argue that, because the contract is illegible and fails to identify the sellers, it fails under the statute of frauds. The statute of frauds provides that a contract for the sale of real estate is not enforceable unless it is in writing and signed by the person to be charged with the agreement. TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(4) (West 2009). To comply with the statute, the writing must contain the essential terms of the contract, expressed with such certainty that they may be understood without resorting to oral testimony. *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978). The contract for the sale of the Stanford house was in writing, contained the essential terms of the agreement, and was signed by both the Olmsteads and the Goldmans. It, therefore, complied with the statute of frauds.

We conclude the trial court did not err by concluding the contract was enforceable.

*Void or Voidable Contract*

Relying on title 22, section 535.144(a) of the Texas Administrative Code, the Goldmans next contend that, because Smith failed to timely disclose that she is Summer Olmstead's mother, the contract to purchase the Stanford house was either void or voidable as against public policy. Whether a contract violates public policy is a question of law that we review de novo. *Johnson v. Structured Asset Servs., LLC*, 148 S.W.3d 711, 726 (Tex. App.—Dallas 2004, no pet.).

"A court can declare a contract void as against public policy and refuse to enforce it." *In re C.H.C.*, 396 S.W.3d 33, 51 (Tex. App.—Dallas 2013, no pet.). Texas expresses its public

policy through its statutes and regulations. *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 250 (Tex. 2002); *S. Cnty. Mut. Ins. v. Sur. Bank, N.A.*, 270 S.W.3d 684, 689 (Tex. App.—Fort Worth 2008, no pet.) (recognizing Texas public policy as expressed through statutes and regulations); *see also Dugger v. Arredondo*, No. 11-0549, 2013 WL 4608741, at *9 (Tex Aug. 30, 2013). "In examining an agreement to determine if it is contrary to public policy, a court looks to whether the agreement has a tendency to injure the public good and considers the development and policies underlying any applicable statutes." *Interstate 35/Chisam Road, L.P. v. Moayedi*, 377 S.W.3d 791, 797 (Tex. App.—Dallas 2012, pet. filed); *see also Fairfield Ins. Co. v. Stephens Martin Paving, L.P.*, 246 S.W.3d 653, 665–66 (Tex. 2008). The rule that public policy precludes the enforcement of an otherwise valid contract should be applied cautiously and only in cases involving dominant public interests. *Johnson*, 148 S.W.3d at 726.

Section 1101.652(a)(3) of the occupations code provides, in relevant part, that the TREC may suspend or revoke a license issued under chapter 1101 of the code or take disciplinary action authorized by chapter 1101 of the code if a license holder[3] engages in misrepresentation, dishonesty, or fraud when selling real property in the name of a person related to the license holder within the first degree by consanguinity. TEX. OCC. CODE ANN. § 1101.002(4), (7); 1101.652(a)(3)(C) (West 2012). For purposes of section 1101.652(a)(3) "a person related to the license holder within the first degree by consanguinity" is the license holder's parent or child. 22 T.A.C. § 535.144(a)(1). The regulations in effect in September 2009 required a license holder engaged in a real estate transaction for a child of the license holder to inform any person with whom the license holder dealt, either by disclosure in any contract of sale or in any other writing

---

[3] A license issued under chapter 1101 includes a license issued to a "salesperson." TEX. OCC. CODE ANN. § 1101.002(4). A "salesperson" is "a person who is associated with a licensed broker for the purpose of performing" certain specified activities. *Id.* §1101.002(7). These activities include selling, offering to sell, negotiating or attempting to negotiate the sale, or listing for sale real estate in exchange for a commission or other valuable consideration or with the expectation of receiving a commission or other valuable consideration. *Id.* § 1101.002(1)(i)–(iii). It is undisputed that Smith is a license holder under chapter 1101.

given prior to entering into any contract of sale, that she was a licensed real estate salesperson acting on behalf of her child. 31 Tex. Reg. 1406 (2006), *adopted* 31 Tex. Reg. 4198 (2006) (amended by 35 Tex. Reg. 8268 (2010), *adopted* 35 Tex. Reg. 11691 (2010) and by 38 Tex. Reg. 1332 (2013), *adopted* 38 Tex. Reg. 3347 (2013) (codified at 22 Tex. Admin. Code § 535.144(b)).

Smith failed to disclose to the Goldmans, prior to the execution of the contract of sale for the Stanford house on September 26, 2009, that she is Summer Olmstead's mother. Rather, she first made the disclosure in the October 3, 2009 amendment to the contract. The Goldmans argue section 535.144 of the administrative code sets out the public policy of Texas that a real estate agent selling residential real property for her child is required to disclose the relationship to the buyer and that, when a disclosure is required under section 535.144 but is not made, any related contract for the sale of real estate is void or voidable as against public policy.

Section 1101.652 of the occupations code relates solely to the suspension or revocation of a license issued under chapter 1101. *Northborough Corporate Ltd. P'ship, L.L.P. v. Cushman & Wakefield of Tex., Inc.*, 162 S.W.3d 816, 821 (Tex. App.—Houston [14th Dist.] 2005, no pet.). A license holder is subject to administrative penalties for a violation of either section 1101.652(a)(3) of the occupations code or of section 533.144 of the administrative code. *See* 32 Tex. Reg. 7655 (2007), *adopted* 32 Tex. Reg. 9995 (2007) (current version at 22 T.A.C. § 535.191(d)(11), (e)(10)). Neither section 1101.652 of the occupations code nor any applicable version of section 535.144 of the administrative code provides that the non-compliance of the license holder causes any related contract for the sale of real estate to be void. Further, the occupations code sets out a procedure by which a person injured by a license holder's violation of section 1101.652(a)(3) can be made whole through the payment of a claim from the TREC recovery trust account. *See* TEX. OCC. CODE ANN. §§ 1101.601–.602, .605–.612 (West 2012).

We conclude the public policy of Texas, as expressed in its statutes and regulations, is (1) to allow the TREC to discipline a real estate agent who fails to comply with section 1101.652(a)(3) of the occupations code or section 535.144 of the administrative code, and (2) to compensate a party aggrieved by a license holder's failure to comply with section 1101.652(a)(3) through the payment of damages. Accordingly, we cannot conclude the related real estate contract is void. *Davis v. Hendrick Autoguard, Inc.*, 294 S.W.3d 835, 840 (Tex. App.—Dallas 2009, no pet.) ("[W]here the legislature creates a statutory framework to secure performance of and compliance with a statute, it is 'the reasonable implication that the legislature meant for only the statutory remedies to be applied, and did not mean for courts to refuse to enforce contracts, which were not declared void or unenforceable, though in contravention of the statute.'") (quoting *Borger v. Brand*, 131 Tex. 614, 619, 118 S.W.2d 303, 306 (1938)); *New Boston Gen. Hosp., Inc. v. Tex. Workforce Comm'n*, 47 S.W.3d 34, 40 (Tex. App.—Texarkana 2001, no pet.) (op. on reh'g).

*Termination of Contract on Its Own Terms*

The Goldmans next argue the contract terminated on its own terms when the Olmsteads received the email on October 13, 2009 from Bank of America stating its underwriter required a legible copy of the contract. The Goldmans contend this communication informed the Olmsteads that the Goldmans could not obtain financing and was received by the Olmsteads within the thirty-day period during which the contract could be terminated under the financing contingency.

The financing contingency in the contract allowed the Goldmans to terminate the contract by written notice to the Olmsteads if, within thirty days after the effective date of the contract, the Goldmans could not obtain financing approval on certain listed terms. It is undisputed the Goldmans did not provide written notice that they were terminating the contract within thirty

–11–

days of the effective date of the contract. Further, even if an email from Bank of America could constitute notice from the Goldmans that they were exercising their right to terminate the contract due to an inability to obtain financing, the email relied upon by the Goldmans neither terminated the contract nor indicated the Goldmans could not obtain financing from Bank of America. Rather, the Bank of America email stated merely that the underwriter required a legible copy of the contract. Further, the parties did not treat the contract as terminated following the email. *See Mattlage v. Mattlage*, 243 S.W.3d 763, 770–71 (Tex. App.—Waco 2007, pet. denied). We conclude the trial court did not err by determining, as a matter of law, that the October 13, 2009 email from Bank of America did not terminate the contract under the financing contingency.

*Novation*

The Goldmans finally argue the copy of the contract signed on or around October 14, 2009 was a novation of the September 26, 2009 contract and they timely terminated the new contract pursuant to the financing contingency provision. A novation is the substitution of a new agreement in place of an existing agreement between the parties. *In re B.N.L.-B.*, 375 S.W.3d 557, 562 (Tex. App.—Dallas 2012, no pet.). "A novation occurs if a contract evidences an intention to relinquish and extinguish pre-existing claims and rights of action; in lieu of the old obligation, a party accepts the promise of performance of the new obligation instead of the performance itself." *Fulcrum Cent. v. AutoTester, Inc.*, 102 S.W.3d 274, 277 (Tex. App.—Dallas 2003, no pet.).

To establish a novation, the party must prove: (1) a previous valid obligation; (2) an agreement of the parties to a new contract; (3) the extinguishment of the old contract; and (4) the validity of the new contract. *In re B.N.L.-B*, 375 S.W.3d at 562 (citing *Fulcrum Cent.*, 102 S.W.3d at 277). The substitution of a new agreement occurs when a later agreement is so

inconsistent with a former agreement that the two cannot subsist together. *Id.* at 562–63. "In the absence of inconsistent provisions, 'a second contract will operate as a novation of a first contract only when the parties to both contracts intend and agree that the obligations of the second shall be substituted for and operate as a discharge of the obligations of the first.'" *Fulcrum Cent.*, 102 S.W.3d at 277 (quoting *Chastain v. Cooper & Reed*, 152 Tex. 322, 325, 257 S.W.2d 422, 424 (1953)). Whether a subsequent agreement works a novation of an earlier agreement is a question of intent. *Id.* The parties must have clearly intended a novation and a novation is never presumed. *White v. Harrison*, 390 S.W.3d 666, 675 (Tex. App.—Dallas 2012, no pet.); *Fulcrum Cent.*, 102 S.W.3d at 278. "In the absence of express agreement, whether a new contract operates as a novation of an earlier contract is 'usually a question of fact, and can only become a question of law when the state of the evidence is such that reasonable minds cannot differ as to its effect.'" *Fulcrum Cent.*, 102 S.W.3d at 278 (quoting *Chastain*, 152 Tex. at 325, 257 S.W.2d at 424).

In response to the Olmsteads' breach of contract claims, the Goldmans asserted the affirmative defense of novation. The Olmsteads moved for partial summary judgment on the Goldmans' liability for breach of contract and specifically asserted that, as a matter of law, there had not been a novation of the contract. The Olmsteads argued the October 14, 2009 contract was a reiteration or retyping of the September 26, 2009 contract and "[b]y signing retyped pages of the Contract, the parties did not intend to restart the Financing Addendum deadline, extinguish the Original Contract Document or Repair Amendment, or create a new contract." The Goldmans responded to the Olmsteads' motion for partial summary judgment, and also moved for summary judgment, asserting the payment terms in the September 26, 2009 and the October 14, 2009 contracts were inconsistent because the October 4, 2009 contract did not include the $1,000 repair credit. The Goldmans raise the same argument on appeal.

–13–

The trial court granted the Olmsteads' motion for partial summary judgment and denied the Goldmans' motion for summary judgment without stating the basis for the rulings. In order to obtain a reversal of a summary judgment, an appellant must attack every ground relied on for which summary judgment could have been granted. *Malooly Bros., Inc. v. Napier*, 461 S.W.2d 119, 121 (Tex. 1970); *Trevino & Assocs. Mech., L.P. v. Frost Nat'l Bank*, 400 S.W.3d 139, 144 (Tex. App.—Dallas 2013, no pet.). If an appellant fails to challenge one of the grounds for summary judgment, an appellate court may affirm the summary judgment on that ground alone. *Trevino & Assocs. Mech., L.P.*, 400 S.W.3d at 144. The Goldmans have failed to challenge on appeal the Olmsteads' ground for summary judgment that the parties did not intend for the October 14, 2009 contract to be a novation of the September 26, 2009 contract. Because the Olmsteads' motion for partial summary judgment contains grounds for summary judgment that the Goldmans failed to adequately challenge in their appellate brief, we affirm the trial court's judgment that there was not a novation of the contract. *See Malooly*, 461 S.W.2d at 121; *Trevino & Assocs. Mech., L.P.*, 400 S.W.3d at 144.

*Conclusion*

We conclude the trial court did not err by granting the Olmsteads' motion for partial summary judgment on the issue of whether the Goldmans were liable for breach of contract and by denying the Goldmans' motion for summary judgment on grounds the contract was not enforceable, terminated on its own terms, or was void or voidable, and that the October 14, 2009 contract was a novation of the September 26, 2009 contract. We resolve the Goldmans' first and second issues against them.

**Failure to Make Findings of Fact and Conclusions of Law**

In their third issue, the Goldmans assert the trial court erred by failing to make findings of fact and conclusions of law following the bench trial. After the parties' briefs in this case

–14–

were filed, the trial court made findings of fact and conclusions of law. We can consider findings of fact and conclusions of law signed after a trial court has lost plenary power. *HSBC Bank USA, N.A. v. Watson*, 377 S.W.3d 766, 772 (Tex. App.—Dallas 2012, pet. filed); *Morrison v. Morrison*, 713 S.W.2d 377, 381 (Tex. App.—Dallas 1986, writ dism'd) (concluding there is no jurisdictional impediment to a trial court's making belated findings of fact).

After the trial court made its findings of fact and conclusions of law, no party to this appeal requested permission to file supplemental briefing to challenge any of the findings of fact. *See In re K.L.W.*, 301 S.W.3d 423, 428 n.5 (Tex. App.—Dallas 2009, no pet.). Further, at oral argument, the Goldmans represented the only finding they would have challenged if the findings had been made timely was that their DTPA claims against Hewett and NRT were "based on professional advice, judgment, opinion or similar skill for which they cannot be liable." However, the trial court also made findings that the Goldmans' DTPA claims failed because they "did not rely on any act or practice of Hewett to their detriment" and because "[n]o act or omission of Hewett was a producing cause of the Goldmans' damages." These findings form an independent basis for the denial of the Goldmans' DTPA claims.

We conclude the Goldmans have failed to demonstrate any harm from the trial court's failure to make timely findings of fact and conclusions of law. *See Oliphant Fin. LLC v. Angiano*, 295 S.W.3d 422, 424 (Tex. App.—Dallas 2009, no pet.) (when appellant fails to challenge all independent grounds supporting judgment, "we must accept the validity of that unchallenged independent ground," and any error identified by appellant is harmless); *In re A.E.A.*, No. 02-12-00510-CV, 2013 WL 3761309, at *9 (Tex. App.—Fort Worth July 18, 2013, no pet.) (any error in trial court's finding of fact was harmless due to appellant's failure to challenge all bases of finding on appeal). We resolve the Goldmans' third issue against them.

**Damages**

In their fifth issue, the Goldmans contend the trial court erred by awarding the Olmsteads damages based on the carrying costs of the Stanford house after the Goldmans breached the contract until the house was sold because this is not the correct measure of damages for the breach of a residential real estate contract. Whether the trial court erred by applying an improper measure of damages is a question of law that we review de novo. *City of Carrollton v. RIHR Inc.*, 308 S.W.3d 444, 452 (Tex. App.—Dallas 2010, pet. denied).

The contract provided that, if the Goldmans failed to comply with the contract, the Olmsteads could "(a) enforce specific performance, seek such other relief as may be provided by law, or both, or (b) terminate this contract and receive the earnest money as liquidated damages, thereby releasing both parties from this contract." The Olmsteads chose to proceed under option (a) in the contract, seeking specific performance or, alternatively, damages for the breach. The Olmsteads subsequently amended their petition and requested only damages for the breach.

At various points in the litigation, the Olmsteads sought damages based on the difference between the $810,000 the Goldmans agreed to pay for the Stanford house and the amount for which the house was ultimately sold, the loss of rental income resulting from the Olmsteads' tenants vacating the house, and the costs of carrying the house after the Goldmans breached the contract. However, prior to trial, the Olmsteads dropped their claims for damages based on the difference in the contract prices and for lost rents and, at trial, sought only to recover as actual damages "their mortgage interest, utilities, taxes, insurance, and lawn care." The Olmsteads offered evidence that between the time of the Goldmans' breach and the sale of the Stanford house in November 2010, they paid $56,929.85 for mortgage interest, utilities, property taxes, insurance, and yard maintenance for the Stanford house.

The Goldmans assert the proper measure of damages for breach of a residential real estate contract is the difference between the contract price and the market value of the property on the date of the breach and that the carrying costs recovered by the Olmsteads, while perhaps recoverable as part of an equitable accounting in a suit for specific performance of the contract, are not recoverable in a suit for damages.

Generally, the measure of actual damages in a breach of contract case is the loss of the benefit of the bargain, which would put the plaintiff in the same economic position he would have been in had the contract actually been performed. *Am. Nat'l Petroleum Co. v. Transcon. Gas Pipe Line Corp.*, 798 S.W.2d 274, 278 (Tex. 1990); *Barry v. Jackson*, 309 S.W.3d 135, 140 (Tex. App.—Austin 2010, no pet.) (op. on reh'g). When a real estate contract is breached by the purchaser, the measure of damages is the difference between the price the seller was to receive and the market value of the property at the date of the breach. *Kempner v. Heidenheimer*, 65 Tex. 587, 591 (1886); *Long v. Brown*, 593 S.W.2d 371, 372 (Tex. Civ. App.—Dallas 1979, writ ref'd n.r.e.); *Barry*, 309 S.W.3d at 140.[4] In this case, the Goldmans agreed to purchase the Stanford house for $810,000, and the Olmsteads admitted the market value of the house on the date of the breach was $810,000. However, relying on *Barry* and *Claflin v. Hillock Homes, Inc.*, 645 S.W.2d 629, 630 (Tex. App.—Austin 1983, writ ref'd n.r.e.), the Olmsteads contend they are not limited to the general measure of damages and may recover, as consequential damages, their carrying costs of the Stanford house from the date of the breach until they sold the house a year later.

We first note that the Olmsteads' reliance on *Claflin* is misplaced. In *Claflin*, Janis Claflin agreed to purchase a home from Hillock Homes, Inc. *Claflin*, 645 S.W.2d at 631. After

---

[4] *See also Kollmeyer v. Stewart*, No. 05-00-01787-CV, 2001 WL 1570322, at *3 (Tex. App.—Dallas Dec. 11, 2001, no pet.) (not designated for publication).

Claflin failed to close on the contract, Hillock Homes sued her for breach of contract and requested specific performance. *Id.* at 632. The trial court granted Hillock Homes' request for specific performance and awarded it attorney's fees as well as additional expenses it incurred in continuing to finance the interim construction loan with which it originally built the house. *Id.* at 630.

On appeal, the Austin Court of Appeals first determined the trial court did not err by granting Hillock Homes' request for specific performance. *Id.* at 633–34. It then turned to Claflin's argument that Hillock Homes could not recover its carrying costs because it failed to mitigate its damages by renting the house or by requiring sufficient earnest money to cover the interim financing charges. *Id.* at 635. The court of appeals, in concluding the trial court did not err by awarding Hillock Homes its carrying costs, noted the carrying costs were not damages per se, but a form of equitable accounting in a suit involving specific performance. *Id.* at 635.

Specific performance is an equitable remedy that may be awarded for a breach of contract, *Stafford v. S. Vanity Magazine, Inc.*, 231 S.W.3d 530, 535 (Tex. App.—Dallas 2007, pet. denied), and is an alternative remedy to damages. *Levetz v. Sutton*, 404 S.W.3d 798, 805 (Tex. App.—Dallas 2013, pet. filed) (citing *Paciwest, Inc. v. Warner Alan Props., LLC*, 266 S.W.3d 559, 571, 575 (Tex. App.—Fort Worth 2008, pet. denied)). A party suing for breach of a contract involving the sale of real estate must elect to sue either for money damages or specific performance. *Davis v. Luby*, No. 04-09-00662-CV, 2010 WL 3160000, at *3 (Tex. App.—San Antonio Aug. 11, 2010, no pet.) (mem. op.); *Byram v. Scott*, No. 03-07-00741-CV, 2009 WL 1896076, at *3 (Tex. App.—Austin July 1, 2009, pet. denied) (mem. op.). If the party sues for damages, he has elected to treat the contract as terminated by the breach and to seek compensation for that breach. *Davis*, 2010 WL 3160000, at *3; *Byram*, 2009 WL 1896076, at

*3.  If the party sues for specific performance, he affirms the contract and requests the trial court to effectuate the agreement.  *Davis*, 2010 WL 3160000, at *3; *Byram*, 2009 WL 1896076, at *3.

The relief associated with specific performance may include monetary compensation in narrow circumstances—when it is deemed necessary to place the parties in the same position as if the contract had been performed in full.  *Heritage Hous. Corp. v. Ferguson*, 674 S.W.2d 363, 366 (Tex. App.—Dallas 1984, writ ref'd n.r.e.); *Davis*, 2010 WL 3160000, at *4.  This compensation is incident to a decree for specific performance and does not amount to legal damages for breach of contract.  *Heritage Hous. Corp.*, 674 S.W.2d at 365.  The rationale for the compensation "is that the contract is being enforced retrospectively and the equities adjusted accordingly."  *Id.*  Therefore, when a trial court orders specific performance of a contract to purchase real property, "the court will enforce the equities of the parties in such a manner as to put them as nearly as possible in the position they would have occupied had the conveyance been made when required by the contract."  *Id.* at 366.  The trial court, in order to relate the performance back to the contract date, may equalize "any losses occasioned by the delay by offsetting them with money payments."  *Id.*  The trial court, in a balancing of the equities, can include in this accounting items such as "rents, profits, delay costs, and like items."  *Davis*, 2010 WL 3160000, at *4 (quoting *Byram*, 2009 WL 1896076, at *4).

In this case, the Olmsteads did not pursue their request for specific performance of the contract and elected instead to recover money damages.  Accordingly, the trial court could not order the contract to be performed and then balance the equities to award compensation that would place the Olmsteads in the same position as if the contract had been timely performed.  The well-established case law on the trial court's ability to perform an equitable accounting in a suit for specific performance does not support the Olmsteads' claim that they are entitled to

–19–

recover the carrying costs of the Stanford house as monetary damages for the Goldmans' breach of contract.

The Olmsteads also rely on the Austin Court of Appeals' opinion in *Barry* to support their claim they can recover their carrying costs as consequential damages for the Goldmans' breach of contract. In *Barry*, Michael P. Barry executed a contract to buy Donald and Karen Jackson's house for $370,000. *Barry*, 309 S.W.3d at 137. The Jacksons then executed a contract to buy another house. *Id.* Shortly after the Jackson's option period on the new house expired, Barry notified them that he would not purchase their house. *Id.* The Jacksons lost the earnest money they deposited in conjunction with the contract on the new house, as well as an option-period fee and a fee to have the new house inspected. *Id.* More than a year after Barry breached the contract, the Jacksons sold their house for $31,000 less than Barry had agreed to pay and were required to pay more for repairs and closing costs than were associated with the contract with Barry. *Id.* at 138. The Jacksons sued Barry for breach of contract. *Id.* The trial court awarded the Jacksons damages of $46,965 for breach of contract, $3,889 for "out of pocket damages" and $23,165 in attorney's fees. *Id.* at 138–39.

On appeal, the Austin Court of Appeals recognized the general measure of damages for the breach of a contract to purchase real estate is the difference between the contract price and the property's value at the time of the breach. *Id.* at 140. The appellate court concluded the Jacksons failed to present any evidence of the market value of the house at the time of the breach or that the sale price more than a year after the breach occurred within a reasonable time of the breach. *Id.* at 141–42. Accordingly, the Jacksons could not recover the difference in price between the two contracts or the increased contract costs associated with the second contract. *Id.* at 142.

The court of appeals concluded the Jacksons were, however, entitled to recover the earnest money, option fee, and inspection costs that they lost when they were required to breach the contract to purchase the new house. *Id.* The court noted the Jacksons:

> presented ample evidence that they entered into the Pebble Garden contract due to Barry's signing of the contract and that they were forced to break the contract, losing $3,889 in inspection fees, option fees, and earnest money, when Barry informed them that he was breaching his contract too late for them to cancel the Pebble Garden contract without penalty.

*Id.*

In *Barry*, the damages awarded to the Jacksons were all incurred on the date of Barry's breach and were directly related to the breach. In this case, the Olmsteads seek damages that were incurred after the date of the breach, but claim the costs are recoverable because they flowed from the breach and were foreseeable on the date of the breach. However, the length of time the Olmsteads would continue to own the house after the breach was not foreseeable on the date of the breach, and we have found no case that allows a non-breaching seller of residential real estate to recover its costs of ownership of the property from the date of the breach until the property is ultimately sold to another purchaser. Further, allowing such damages to be recovered as consequential damages for the breach of a contract to purchase residential real estate could incent the seller to hold the property indefinitely while waiting for market conditions to change, or for a purchaser willing to pay a specific price, because the seller knows his breaching buyer is responsible for all costs the seller is incurring by continuing to own the property. We decline to change well-established Texas law concerning the appropriate measure of damages for the breach of a contract to purchase residential real estate by allowing the recovery of mortgage interest, utilities, taxes, insurance, and lawn care paid by a non-breaching seller following the breach of a contract.

–21–

Damages for breach of a contract to buy or sell real estate are "uncertain and not easily estimated with accuracy." *Chan v. Montebello Dev. Co.*, No. 14-06-00936-CV, 2008 WL 2986379, at *3 (Tex. App.—Houston [14th Dist.] July 31, 2008, pet. denied) (mem. op.) (quoting *Thanksgiving Tower Partners v. Anros Thanksgiving Partners*, 64 F.3d 227, 232 (5th Cir. 1995)). For this reason, when a buyer defaults, the seller may seek specific performance "or usually receives any earnest money and retains the value of the use and ownership of the property." *Barry*, 309 S.W.3d at 140 n.8. Here, the Olmsteads declined to pursue either of these options and sought to recover damages. Under Texas law, those damages are measured by the difference between the contract price and the market value of the Stanford house on the date the Goldmans breached the contract. The evidence established there was no difference in the contract price and the market value on the date the Goldmans breached the contract.

We conclude the trial court used an improper measure of damages and erred by awarding the Olmsteads their carrying costs of the Stanford house for the year following the date of the breach. Further, the Olmsteads failed to prove they suffered any damages under the correct legal measure of damages. Accordingly, we resolve the Goldmans' fifth issue in their favor and render judgment that the Olmsteads take nothing on their breach of contract claim against the Goldmans.

### Rule 11 Agreement

In their fourth issue, the Goldmans argue the trial court erred by granting the Olmsteads' request to amend their petition in contravention of the parties' rule 11 agreement. In the Olmsteads' fourth amended petition, the only factual allegations pertaining to the Olmsteads' damages were that they were "substantial" and "in excess of the jurisdictional limits" of the trial court. Following the filing of the fourth amended petition, the parties entered into a rule 11 agreement that, in the event the case went to trial as scheduled, the Olmsteads would not amend

their petition to assert new factual allegations, but could amend to correct "technical defects." On the day of trial, the Olmsteads sought leave to file a fifth amended petition that asserted their damages included "costs of ownership and maintenance of the Property such as mortgage interest payments, homeowners' insurance payments, utility payments, lost rents, groundskeeping, maintenance, and property taxes, until the property could be sold to alternate buyers." The trial court granted the Olmsteads' request.

We have concluded the damages allowed by Texas law for the breach of a residential real estate contract do not include the damages sought by the Olmsteads and have rendered judgment that the Olmsteads take nothing on their breach of contract claim. Accordingly, we need not address whether the trial court erred by allowing the Olmsteads to amend their petition on the day of trial to plead for those damages. *See* TEX. R. APP. P. 47.1.

### Expert Testimony

In their sixth issue, the Goldmans contend the trial court erred by allowing the Olmsteads' attorney and Hewett and NRT's attorney to testify about the fees incurred in this case because the general substance of their testimony was not properly disclosed in response to the Goldmans' requests for disclosure. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). The trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985).

The Goldmans served pretrial requests for disclosures on both the Olmsteads and on Hewett and NRT. In response, the Olmsteads identified Maryann Brousseau and Cynthia Dooley as experts on the issue of attorney's fees and informed the Goldmans:

> Ms. Brousseau is an attorney who has been licensed to practice law since November 1984. Ms. Dooley is an attorney who has been licensed to practice law

–23–

since November 1992. Both Ms. Brousseau and Ms. Dooley are experts on the reasonableness of attorneys' fees in Dallas County, Texas. Ms. Brousseau and/or Ms. Dooley will testify concerning the reasonableness of attorneys' fees charged in this case. Neither Ms. Brousseau nor Ms. Dooley has prepared a report. Neither Ms. Brousseau nor Ms. Dooley has rendered an opinion on the reasonableness of attorneys' fees charged in this case, since the fees continue to accrue. Ms. Brousseau and Ms. Dooley's legal qualifications have been produced.

Hewett and NRT identified Constance Ariagno and Shannon Conway as experts on the issue of attorney's fees and informed the Goldmans:

Ms. Ariagno and/or Ms Conway are expected to testify regarding the necessity and reasonableness of attorneys' fees in this case up to trial and appeal.

Ms. Ariagno's and Ms. Conway's opinions are based on their years of experience, personal participation in the lawsuit, and on the factors described in Texas Disciplinary Rules of Professional Conduct that are applicable to this type of action and its circumstances. Ms. Arigano's and Ms. Conway's current resumes and bibliographies are available online at www.pattonboggs.com.

The Goldmans objected to both Dooley and Ariagno testifying on the ground the responses to the request for disclosure failed to disclose the general substance of their opinions. The trial court overruled the objections and Dooley testified as to the attorney's fees incurred by the Olmsteads and Ariagno testified as to the attorney's fees incurred by Hewett and NRT.

Rule of civil procedure 194.2(f) allows a party to request disclosure of the general substance of an expert's mental impressions and opinions and a brief summary of the basis for them. TEX. R. CIV. P. 194.2(f). In response to the Goldmans' discovery requests, the Olmsteads and Hewett and NRT disclosed the identity of the attorneys who might testify about the respective party's attorney's fees incurred in this case and about the reasonableness and necessity of the fees. These disclosures provided the Goldmans with the general substance of counsels' anticipated testimony. *See Reynolds v. Nagely*, 262 S.W.3d 521, 531 (Tex. App.—Dallas 2008, pet. denied); *Hawkins v. Jones*, No. 05-06-00139-CV, 2007 WL 2004913, at *2 (Tex. App.—Dallas July 12, 2007, pet. denied) (mem. op.). Further, both the Olmsteads and Hewett and NRT

sought to recover attorney's fees incurred throughout the litigation, which necessarily precluded opinions on the reasonableness and necessity of total fees at the time of the disclosures. This record supports a determination that the Olmsteads and Hewett and NRT sufficiently complied with the disclosure rules. *See Reynolds*, 262 S.W.3d at 531; *Hawkins*, 2007 WL 2004913, at *2.

Further, implicit in the trial court's overruling of the Goldmans' objections and allowing Dooley and Ariagno to testify is a finding of either good cause or lack of unfair surprise or undue prejudice. *See Parker Plaza W., Ltd. v. Boniuk Invs., Ltd.*, 153 S.W.3d 729, 733–34 (Tex. App.—Dallas 2005, no pet.); *Bellino v. Comm'n for Lawyer Discipline*, 124 S.W.3d 380, 384 (Tex. App.—Dallas 2003, pet. denied); *see also* TEX. R. CIV. P. 193.6(a). Based on the record before us, we conclude the trial court did not abuse its discretion by impliedly finding the Goldmans were not unfairly surprised by either the Olmsteads' or Hewett and NRT's failure to disclose additional information.[5] We resolve the Goldmans' sixth issue against them.

### Attorney's Fees to Hewett and NRT

In their eighth issue, the Goldmans argue the trial court erred by awarding Hewett and NRT attorney's fees because they were not prevailing parties under the contract. Whether a party is entitled to recover attorney's fees is a question of law that we review de novo. *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam); *Spector Gadon & Rosen, P.C. v. Sw. Securities, Inc.*, 372 S.W.3d 244, 248 (Tex. App.—Dallas 2012, no pet.)

In their third-party petition against Hewett and NRT, the Goldmans asserted claims against Hewett based on negligence, breach of fiduciary duty, violations of the DTPA, fraud in a real estate transaction, fraud, and negligent misrepresentation, and sought to hold NRT liable for

---

[5] We note the Goldmans could have filed a motion to compel under rule 215 of the Texas Rules of Civil Procedure to obtain more specific information, but failed to do so. *See* TEX. R. CIV. P. 215.1. Further, the calculation of the amount of attorney's fees incurred by a party is not an economic damage that is required to be disclosed in response to a request for disclosure. *Jespersen v. Sweetwater Ranch Apartments*, 390 S.W.3d 644, 660–61 (Tex. App.—Dallas 2012, no pet.)

Hewett's actions based on the doctrine of respondeat superior. The Goldmans sought to recover attorney's fees based on their claims for violations of the DTPA and fraud in a real estate transaction. *See* TEX. BUS. & COM. CODE ANN. §§ 17.50(d) (West 2011); 27.01(e) (West 2009).

In their answer, Hewett and NRT sought to recover attorney's fees pursuant to section 17.50(c) of the business and commerce code, alleging the Goldmans' complaints under the DTPA were brought in bad faith or for purposes of harassment. Hewett also filed a counterclaim for fraud against the Goldmans, and both Hewett and NRT filed a counterclaim seeking to recover attorney's fees from the Goldmans based on a provision in the contract for the Stanford house that states, "A Buyer, Seller, Listing Broker, Other Broker, or escrow agent who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding."

The trial court rendered judgment that the Goldmans take nothing on their claims against Hewett and NRT and that Hewett take nothing on her fraud claim against the Goldmans. The trial court found that Hewett and NRT were prevailing parties under the contract and the Goldmans were not prevailing parties. The trial court also found that Hewett and NRT had incurred reasonable and necessary attorney's fees in the amount of $150,000 "in this legal proceeding related to the Contract" and would incur additional, contingent fees in the case of an appeal.

The Goldmans first argue Hewett and NRT are not entitled to recover under the provision in the contract regarding recovery of attorney's fees because they did not enter into a brokerage agreement with the Goldmans until after the contract was executed and, therefore, are not "other brokers" under the contract. The Goldmans' briefing of this argument consists of six lines and fails to cite to any supporting authority. An appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."

TEX. R. APP. P. 38.1(i). Failure to cite applicable authority or provide substantive analysis waives an issue on appeal. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). We conclude nothing is presented for our review on this argument. *Id.*

The Goldmans next contend that Hewett and NRT are not entitled to recover attorney's fees because they are not prevailing parties under the contract. The Goldmans specifically argue that, even though Hewett and NRT successfully defended against the Goldmans' claims, they also successfully defended against Hewett's fraud claim. Therefore, the Goldmans assert, there is either no prevailing party or both parties are prevailing parties.

Texas's common law has long followed the "American Rule" pursuant to which parties to litigation bear their own attorney's fees unless such expenses are specifically made recoverable by statute or contract. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 669 (Tex. 2009); *see also Epps v. Fowler*, 351 S.W.3d 862, 865 (Tex. 2011). In this case, the contract for the sale of the Stanford house provided that the prevailing party in any legal proceeding related to the contract is entitled to recover reasonable attorney's fees.

A prevailing party is the party who successfully prosecutes a cause of action or defends against it. *Silver Lion v. Dolphin St., Inc.*, No. 01-07-00370-CV, 2010 WL 2025749, at *18 (Tex. App.—Houston [1st Dist.] May 20, 2010, pet. denied) (mem. op. on reh'g); *Robbins v. Capozzi*, 100 S.W.3d 18, 27 (Tex. App.—Texarkana 2002, no pet.); *see also Epps*, 351 S.W.3d at 868–69 (defendant is prevailing party for purposes of award of attorney's fees when plaintiff nonsuits case with prejudice). Here, the Goldmans have not challenged the trial court's finding that this case was a legal proceeding related to the contract for the sale of the Stanford house. Hewett and NRT successfully defended the Goldmans' claims and, therefore, are prevailing parties under the contract. *See Bankcard Processing Intern., L.L.C. v. United Bus. Servs., L.P.*, No. 01-10-01079-CV, 2012 WL 3776024, at *9 (Tex. App.—Houston [1st Dist.] Aug. 30, 2012,

–27–

no pet.) (mem. op.); *Old HH, Ltd. v. Henderson*, No. 03-10-00129-CV, 2011 WL 6118570, at *4 (Tex. App.—Austin Dec. 9, 2011, no pet.) (mem. op.). The contract for the sale of the Stanford house provided the prevailing party is entitled to recover reasonable attorney's fees and, therefore, Hewett and NRT were entitled to recover their reasonable attorney's fees. *See Bankcard Processing Intern., L.L.C.*, 2012 WL 3776024, at *9; *Old HH, Ltd.*, 2011 WL 6118570, at *4.

We need not decide whether the Goldmans were also prevailing parties under the contract by successfully defending against Hewett's fraud claim. Because the Goldmans failed to plead for the recovery of attorney's fees under the contract, they waived any right to recover fees under the contract. *See Intercontinental Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 658–59 (Tex. 2009) (defendant waived right to recover fees under contract by not pleading for attorney's fees under contract and not seeking to amend its pleadings to do so); *Alan Reuber Chevrolet, Inc. v. Grady Chevrolet, Ltd.*, 287 S.W.3d 877, 884 (Tex. App.—Dallas 2009, no pet.); *Kreighbaum v. Lester*, No. 05-06-01333-CV, 2007 WL 1829729, at *3 (Tex. App.—Dallas June 27, 2007, no pet.) (mem. op.) (counterclaim requesting attorney's fee pursuant to DTPA did not give notice party was seeking attorney's fees under contract). We resolve the Goldmans' eighth issue against them.

## Failure to Segregate Attorney's Fees

In their seventh issue, the Goldmans argue the trial court erred by awarding the Olmsteads and Hewett and NRT attorney's fees because Dooley and Ariagno failed to segregate between recoverable and non-recoverable fees. A party seeking to recover attorney's fees has the burden to show that the fees were reasonable and necessary which, among other things, requires the party to show the fees were incurred on a claim that allows recovery of such fees. *Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 10–11 (Tex. 1991). When legal services

advance claims for which the recovery of fees is permitted and claims for which the recovery of fees is not permitted, the party must segregate and exclude the fees for services related to the claims for which fees are not recoverable unless "the discrete legal services advance[d] both [the] recoverable claim and the unrecoverable claim." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006); *see also Petras v. Criswell*, 248 S.W.3d 471, 481 (Tex. App.—Dallas 2008, no pet.). The need to segregate fees is a question of law, while the extent to which certain claims can or cannot be segregated is a mixed question of law and fact. *Tony Gullo Motors I, L.P.*, 212 S.W.3d at 312–13.

The Olmsteads sought to recover attorney's fees as the prevailing party on their breach of contract claim. Over the Goldmans' objection that she failed to segregate between recoverable and non-recoverable fees, Dooley testified the Olmsteads had incurred attorney's fees and costs of $151,110.17 in their prosecution of the suit, which included both breach of contract and fraud claims against the Goldmans. Dooley did not segregate the fees between the claims and did not testify the claims were intertwined to the point of being inseparable. We have affirmed the trial court's judgment that the Goldmans breached the contract to purchase the Stanford house but, based on the Goldmans' challenge to the trial court's measure of damages, have rendered judgment that the Olmsteads recover nothing on their breach of contract claim against the Goldmans. Accordingly, there may no longer be recoverable fees on any of the Olmsteads' claims. *See Intercontinental Grp. P'ship*, 295 S.W.3d at 655–56 (plaintiff who obtains finding that defendant breached contract, but who does not recover any damages, is not prevailing party entitled to recover fees); *Tony Gullo Motors I, L.P.*, 212 S.W.3d 304 (attorney's fees not recoverable on fraud claim). Because our opinion in this case significantly changed the trial court's judgment, we conclude the issue of the award of attorney's fees to the Olmsteads must be reversed and remanded to the trial court for reconsideration in light of this opinion. *See Wells*

*Fargo Bank Nw., N.A. v. RPK Capital XVI, L.L.C.*, 360 S.W.3d 691, 713 (Tex. App.—Dallas 2012, no pet.); *State Farm Lloyds v. C.M.W.*, 53 S.W.3d 877, 894–95 (Tex. App.—Dallas 2001, pet. denied).

Hewett and NRT sought attorney's fees under the DTPA and under the contract.[6] However, Hewett also asserted a claim against the Goldmans for fraud in obtaining the prequalification letter. Hewett's fraud claim was based on conduct by Mark Goldman prior to the execution of the contract and is not clearly based on the contract. Although Ariagno testified Hewett and NRT had incurred $150,000 in reasonable attorney's fees during the case, she did not segregate the fees between the defense of the Goldmans' claims and the prosecution of Hewett's fraud claim. She also failed to testify the claims were so intertwined as to be inseparable. On this record, we cannot say the recoverable fees were not required to be segregated from the unrecoverable fees. *See CTMI, LLC v. Fischer*, No. 05-11-01221-CV, 2013 2725580, at *2 (Tex. App.—Dallas June 12, 2013, no pet.) (mem. op.); *Richardson v. SV Almeda I Ltd. P'ship*, No. 01-11-01004-CV, 2013 WL 4680392, at *18–19 (Tex. App.—Houston [1st Dist.] Aug. 29, 2013, no pet. h.) (mem. op.)

We resolve the Goldmans' seventh issue in their favor. We reverse the trial court's award of attorney's fees to the Olmsteads and to Hewett and NRT and remand the issue of attorney's fees to the trial court.

## Conclusion

We reverse the trial court's award of damages to the Olmsteads and render judgment that the Olmsteads take nothing on their breach of contract claims against the Goldmans. We reverse

---

[6] The Goldmans preserved their complaint regarding Hewett and NRT's failure to segregate fees in a post-trial brief submitted to the trial court prior to the rendition of judgment. *See Am. First Nat'l Bank v. Jordan-Lewis Dev. L.P.*, No. 01-09-00990-CV, 2011 WL 2732779, at *7 (Tex. App.—Houston [1st Dist.] July 14, 2011, no pet.) (mem. op.) (objection to failure to segregate attorney's fees must be raised before trial court renders judgment); *see also S. Concrete Co. v. Metrotec Fin., Inc.*, 775 S.W.2d 446, 450 (Tex. App.—Dallas 1989, no writ) (in bench trial, alleged error based on trial court's award of attorney's fees that should have been segregated, but were not, is preserved by raising issue in motion for new trial).

the award of attorney's fees to the Olmsteads and to Hewett and NRT and remand the issue of attorney's fees to the trial court. In all other respects, we affirm the trial court's judgment.


/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

120146F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MARK GOLDMAN and CAROLINE
GOLDMAN, Appellants

No. 05-12-00146-CV       V.

JEFFREY OLMSTEAD, SUMMER
OLMSTEAD, SANDRA HEWETT, and
NRT TEXAS, LLC, Appellees

On Appeal from the 298th Judicial District
Court, Dallas County, Texas,
Trial Court Cause No. 1001144-M.
Opinion delivered by Justice Fillmore,
Justices Bridges and Lewis participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED** in part and **REVERSED** in part.

We **REVERSE** that portion of the trial court's judgment awarding damages to appellees Jeffrey Olmstead and Summer Olmstead and **RENDER** judgment that appellees Jeffrey Olmstead and Summer Olmstead take nothing on their claims against Mark Goldman and Caroline Goldman. We **REVERSE** that portion of the trial court's judgment awarding attorney's fees to appellees Jeffrey Olmstead, Summer Olmstead, Sandra Hewett, and NRT Texas, LLC.

In all other respects, the trial court's judgment is **AFFIRMED**.

We **REMAND** this cause to the trial court for further proceedings consistent with this opinion. It is **ORDERED** that each party bear its own costs of this appeal.

Judgment entered this 24th day of October, 2013.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

–32–