

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-16-00217-CV
_____

JAMES ROY BRADSHAW, AS TRUSTEE FOR
THE ROBERT MEEKS 1998 TRUST, APPELLANT

V.

G&T FARMS, LLC AND GREG FOSTER D/B/A
FOSTER REAL ESTATE, APPELLEES

On Appeal from the 69th District Court
Hartley County, Texas
Trial Court No. 4706H, Honorable Ron Enns, Presiding

January 12, 2018

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PIRTLE, JJ.

Appellant James Roy Bradshaw, Trustee of the Robert Meeks 1998 Trust, appeals from the trial court's money judgment in favor of appellees, G&T Farms, LLC, and Greg Foster d/b/a Foster Real Estate. We will reverse and render in part, modify in part, and otherwise affirm the trial court's judgment.

## Background

The case arises from a real estate transaction. Bradshaw, as trustee, contracted in 2011 to sell property owned by the Robert Meeks 1998 Trust for some $12 million. Foster was the listing real estate agent for Bradshaw's sale. Bradshaw sought to locate replacement property to purchase in a transaction under section 1031 of the Internal Revenue Code.[1] Foster proposed he acquire an irrigated 1845-acre farm in Hartley County, Texas, owned by G&T Farms. Bradshaw was interested in G&T's property, partly because it adjoined a ranch the Meeks trust owned.

After negotiations, G&T agreed to sell the Hartley County farm to Bradshaw for $4.2 million. The agreement was documented by a Farm and Ranch Contract on a form promulgated by the Texas Real Estate Commission ("TREC").[2] The contract's broker information page, signed by both parties, lists Foster as an intermediary representing seller and buyer. It states Foster, on closing, would receive a fee from seller, G&T. The contract's effective date is stated as June 23, 2011. It shows each party was represented by counsel. Bradshaw deposited $420,000 as earnest money.

The contract called for a closing date of the later of November 4, 2011, or seven days after objections made to title were cured or waived. The remedies available to the non-defaulting party under the contract's default provisions included the remedy of terminating the contract and receiving the earnest money as liquidated damages.

---

[1] 26 U.S.C. § 1031 (2008).

[2] The contract contains a notation as TREC's form no. 25-8.

The sale under the contract was never closed. On November 23, 2011, G&T sent Bradshaw notice of termination of the contract and requested he authorize Foster, who held the earnest money, to release it to G&T. Bradshaw did not sign G&T's proffered release document, and G&T filed suit in February 2012.

G&T alleged Bradshaw breached the contract by failing to close by the closing date, and by failing to sign a release for the earnest money. By an amended petition, G&T also sought declaratory relief and expressly sought liquidated damages of the amount of the earnest money, plus three times the amount of the earnest money, pursuant to a provision of the contract authorizing that amount as liquidated damages.[3]

After a bench trial, the court signed a judgment ordering that Foster release the earnest money to G&T, and ordering that G&T recover damages from Bradshaw of $1,260,000, interest and attorney's fees. It denied claims asserted by Bradshaw, and awarded Foster his attorney's fees.

The court later entered findings of fact and conclusions of law in support of its judgment. On appeal, Bradshaw raises issues contending that the parties had no enforceable contract, that no evidence supported a finding Bradshaw defaulted or that G&T was entitled to the earnest money as liquidated damages, and that G&T was not entitled to the triple liquidated damages provided under paragraph 18.D. Other issues challenge the award of prejudgment interest and attorney's fees.

---

[3] Section 18 of the contract is entitled, "Escrow." Paragraph 18.D., entitled "Damages," states: "Any party who wrongfully fails or refuses to sign a release acceptable to the escrow agent within 7 days of receipt of the request will be liable to the other party for liquidated damages in an amount equal to the sum of: (i) three times the amount of the earnest money; (ii) the earnest money; (iii) reasonable attorney's fees; and (iv) all costs of suit."

3

Analysis

Issue One – Existence of Contract

The essential elements of a breach of contract claim are (1) the existence of a valid contract, (2) the plaintiff performed or tendered performance, (3) the defendant breached the contract, and (4) the plaintiff was damaged as a result of the breach. *Davis v. Friedson,* No. 14-08-01098-CV, 2010 Tex. App. LEXIS 1818, at *15 (Tex. App.—Houston [14th Dist.] March 16, 2010, no pet.) (mem. op.) (citing *Winchek v. Am. Express Travel Related Servs. Co.,* 232 S.W.3d 197, 202 (Tex. App.—Houston [1st Dist.] 2007, no pet.)). Findings of fact in a case tried to the court have the same force and effect as a jury's verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991); *Creative Mfg., Inc. v. Unik, Inc.*, 726 S.W.2d 207, 210 (Tex. App.—Fort Worth 1987, writ ref'd n.r.e.). They are reviewed under the same sufficiency standards applicable to jury verdicts. *Id.* When reviewing legal sufficiency of the evidence, an appellate court considers the evidence in the light most favorable to the fact-finder's decision and indulges every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 826 (Tex. 2005). When reviewing factual sufficiency, appellate courts consider and weigh all of the evidence and will set aside the verdict only if it is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.* at 826. The trial court evaluates the credibility of the witnesses, determines the weight to be given their testimony, and resolves conflicts and inconsistencies in the testimony. *Sw. Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied). An appellate court may not impose its own opinion on these matters contrary to that of the fact-finder. *See City of Keller,* 168 S.W.3d at 819.

4

Among other witnesses, the court heard testimony from Foster, Bradshaw and G&T's only members, brothers Greg and Todd Hodnett. There was testimony that Foster prepared the contract and presented it to Bradshaw, who signed it. There was general agreement in the testimony that G&T made some handwritten changes to the contract after Foster delivered it. After making the handwritten changes, G&T executed the contract and returned it to Foster.

The first of G&T's handwritten changes was to the contract's "special provisions" section. As originally prepared, the contract contained a special provision stating, "This contract is subject to all parties making a 1031 Tax Free Exchange." G&T lined that sentence out, and wrote in a sentence reading, "This contract shall give all parties the right to make a 1031 tax free exchange."

The second change was to the contract's earnest money section which, as prepared, required Bradshaw to deposit $410,000 as earnest money. G&T changed that figure to $420,000.

The third change was made in the section describing the property to be conveyed. That section begins with a paragraph A describing the land. After the legal description of the land, the paragraph's pre-printed language continues, "together with all rights, privileges, and appurtenances pertaining thereto, including but not limited to: water rights, claims, permits, strips and gores, easements, and cooperative or association memberships." Further down, after paragraphs referring to improvements, accessories and crops, is paragraph F, in which interests to be reserved by the seller may be described. It contains pre-printed wording reading, "Seller reserves the following water, timber, or other interests:" followed by a blank line. In this contract, in the blank, Foster

5

put the language, "none all minerals right, [sic] water rights shall go with sale." Before G&T signed the contract, it added to the end of that language, the handwritten words "that are now owned."

By his first issue, Bradshaw argues both that no contract was formed by his exchange of documents with G&T, and that any contract which was formed was unenforceable because it did not comply with the statute of frauds.

*Were G&T's contract modifications material?*

After review of the record, we conclude both of Bradshaw's arguments depend on his assertion that G&T, by its handwritten changes, materially altered the terms of the contract Bradshaw signed. Bradshaw contends that by signing the contract Foster prepared he extended an offer to buy G&T's farm but G&T's actions constituted a rejection and counter offer rather than acceptance of Bradshaw's offer. "A purported acceptance that changes or qualifies an offer's material terms constitutes a rejection and counter offer rather than an acceptance." *Forged Components, Inc. v. Guzman,* 409 S.W.3d 91, 100-01 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *see Davis v. Tex. Farm Bureau Ins.*, 470 S.W.3d 97, 104 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (material change in a proposed contract constitutes a counteroffer). G&T argues its changes were not material.

To determine their material terms, courts examine contracts on a case-by-case basis. *McCalla v. Baker's Campground, Inc.*, 416 S.W.3d 416, 418 (Tex. 2013) (per curiam); *Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 74 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (both citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). We have joined some other Texas courts in holding that a term is material, or essential, if the contracting parties would reasonably

regard it as a vitally important element of their bargain. *Domingo v. Mitchell,* 257 S.W.3d 34, 40-41 (Tex. App.—Amarillo 2008, pet. denied); *see, e.g., General Metal Fabricating Corp. v. Stergiou,* 438 S.W.3d 737, 744 n.4, 5 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

Bradshaw focuses primarily on the language G&T added to the contract's reservation language. He points to the undisputed evidence that the water rights were essential to the value of G&T's irrigated acreage, and that at least some of the water rights actually were held by a corporation owned by Todd Hodnett rather than by G&T itself. Bradshaw then argues that G&T's addition of the words "that are now owned" to the end of the reservation language had the effect of removing those water rights from the transaction.

Whether a particular contractual term is material is a question of law. *Sharifi v. Steen Auto, LLC*, 370 S.W.3d 126, 142 (Tex. App.—Dallas 2012, no pet.) (citing *Parker Drilling*, 316 S.W.3d at 74). We might agree in principle that a contract change deleting the water rights from the sale of irrigated farmland would be a material change. But we cannot agree with Bradshaw's contention such a change is involved here. G&T's additional language does not make the contract's reservation paragraph say G&T was reserving the water rights or that the water rights would not be conveyed. Todd Hodnett testified the water rights would have been conveyed, and Bradshaw testified it was his understanding they would be conveyed.

Bradshaw also contends G&T's substitution of language stating the contract "shall give all parties the right to make" a section 1031 exchange for its original language stating the contract "is subject to all parties making" such an exchange was a material change.

7

Greg Hodnett testified G&T made the language change because it had not identified replacement property for a section 1031 exchange at the time the contract was made in the summer of 2011. G&T points out the change did not preclude either party who desired to do so from engaging in a 1031 exchange.

We agree with G&T that neither of its handwritten changes modified the material terms of the contract Bradshaw signed. *See Forged Components,* 409 S.W.3d at 100-01; *Steen Auto,* 370 S.W.3d at 142. *See also Potcinske v. McDonald Prop. Invs., Ltd.,* 245 S.W.3d 526 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (seller-financing term was material)*; Garrod Invs., Inc. v. Schlegel,* 139 S.W.3d 759, 764-65 (Tex. App.—Corpus Christi 2004, no pet.) (changes to financing provisions and closing date altered material terms).

*Was a contract formed?*

The trial court's findings of fact state its finding G&T and Bradshaw entered into a contract for Bradshaw's purchase of G&T's property. *See Parker Drilling*, 316 S.W.3d at 72 (whether parties reached an agreement is a question of fact). Having concluded that G&T did not reject Bradshaw's offer by making material changes to the contract Bradshaw signed, we consider the evidence supporting the trial court's finding. *See Forged Components,* 409 S.W.3d at 100-01 (unless otherwise indicated, offer may be accepted in any manner reasonable under the circumstances).

Courts base the determination whether a valid offer and acceptance have occurred on objective standards, not the subjective beliefs of the parties. *Davis*, 470 S.W.3d at 106; *Domingo*, 257 S.W.3d at 39. The record contains undisputed evidence that, after making the modifications we have discussed, Greg Hodnett signed the contract on behalf

8

of G&T, initialed its pages and returned the signed contract to Foster.[4] Bradshaw does not deny that such conduct typically would be sufficient to demonstrate the formation of a contract. The court's finding that the parties reached agreement on the sale of the land is supported also by the undisputed evidence Bradshaw deposited the $420,000 earnest money with Foster and, thereafter, instructed that a wheat crop be planted on the cultivated land and that the doors and windows of the house located on the land be boarded-up.

The trial court's finding that the parties formed a contract is supported by legally and factually sufficient evidence.

*Was the contract enforceable?*

Whether an agreement is legally enforceable is a question of law. *Parker Drilling*, 316 S.W.3d at 72. Bradshaw contends the contract, even if formed, was not enforceable because it did not satisfy the requirements of the statute of frauds.

Under the statute of frauds, a contract for the sale of real estate is not enforceable unless the promise or agreement, or a memorandum of it, is (1) in writing; and (2) signed by the person to be charged with the promise or agreement or by someone lawfully

---

[4] Foster testified he told Bradshaw of the changes G&T had made, and that Bradshaw responded, "Okay." He acknowledged he did not show Bradshaw the modified contract and that Bradshaw did not initial the changes or sign the contract after the changes were made. Bradshaw, during his testimony, could not recall whether he signed the contract before or after G&T's changes. The trial court's findings state that Bradshaw "accepted" the handwritten changes. The finding is supported by Foster's testimony, and by the undisputed evidence that Bradshaw deposited earnest money in the amount of $420,000 rather than the $410,000 the contract originally stated. Because we have determined G&T's changes were not material, however, our disposition of Bradshaw's challenge to the formation of a contract is not affected by the correctness of the trial court's findings that Bradshaw accepted them.

9

authorized to sign for him. Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ Aɴɴ. § 26.01(a), (b)(4) (West 2015). "To satisfy the statute of frauds, 'there must be a written memorandum which is complete within itself in every material detail, and which contains all of the essential elements of the agreement, so that the contract can be ascertained from the writings without resorting to oral testimony.'" *Padilla v. LaFrance*, 907 S.W.2d 454, 460 (Tex. 1995) (quoting *Cohen v. McCutchin*, 565 S.W.2d 230, 232 (Tex. 1978)).

Bradshaw's contention the contract violated the statute of frauds is based on his argument G&T modified the contract's material terms by its handwritten changes. Because evidence showed Bradshaw did not sign the contract after G&T made the changes,[5] he argues, the statute is not satisfied.[6] We have determined G&T's handwritten changes did not affect the material terms of the contract. Bradshaw does not contend the completed and signed TREC form contract otherwise lacked any material term of the parties' agreement. *See, e.g., Baker's Campground*, 416 S.W.3d at 418 (agreement for settlement of lawsuit and sale of real property contained general release, description of real property, timeline for closing, identities of transferor and transferee, and price, thus "all material terms"); *Goldman v. Olmstead*, 414 S.W.3d 346, 355 (Tex. App.—Dallas 2013, pet. denied) (signed TREC form contract complied with statute of frauds). Consequently, Bradshaw's statute of frauds defense must fail.

---

[5] G&T's brief argues that Bradshaw's testimony was sufficiently uncertain as to whether he signed before, or after, G&T's changes, to permit the trial court properly to conclude he signed the contract with G&T's changes. We need not address that argument.

[6] Bradshaw acknowledges that application of the statute of frauds is an affirmative defense. Tᴇx. R. Cɪv. P. 94; *Garrod Invs., Inc.,* 139 S.W.3d at 763. He asserts the evidence he never had access to the contract after G&T changed and signed it conclusively establishes its unenforceability under the statute of frauds.

10

For those reasons, Bradshaw's first issue is overruled.

Issue Two – Exception to Statute of Frauds

In its conclusions of law, in addition to its conclusion the parties' contract was not "barred" by the statute of frauds because it was in writing and signed by the parties, the trial court stated the partial performance exception to the statute of frauds was applicable.[7]   The court's findings of fact included a finding that Bradshaw exercised control over the land after execution of the contract by boarding-up the doors and windows of the house and directing that a wheat crop be planted.  By his second issue, Bradshaw argues the partial performance exception does not apply to these facts.  Because we have determined that the parties' contract satisfied the statute of frauds, we need not address the partial performance exception.  TEX. R. APP. P. 47.1.

Issue Three – Evidence of Default

By his third issue, Bradshaw challenges the sufficiency of evidence supporting the trial court's conclusion that he "materially breached" the contract by failing to close his purchase of the land.  The contract's section addressing closing states, "If either party fails to close the sale by the Closing Date, the non-defaulting party may exercise the remedies contained in Paragraph 15 [entitled 'Default']".  Among the remedies in paragraph 15 available to a non-defaulting seller is to terminate the contract and receive the earnest money as liquidated damages.

---

[7] *See National Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426 & n.2 (Tex. 2015) (per curiam) (rejecting application of partial performance exception on facts presented).

11

Citing the Texas Supreme Court's opinion in *Perry v. Little*, 419 S.W.2d 198 (Tex. 1967), Bradshaw asserts there was no probative evidence G&T was ever ready or able to perform its obligations under the contract. And, he argues, it never notified Bradshaw of such readiness or proved any tender of performance such that a breach of contract claim was established.

*Perry v. Little* addresses the nature of the tender of performance required as an element of a breach of contract claim when the contract calls for performance of concurrent obligations, such as the payment of the purchase price on delivery of the purchased property. 419 S.W.2d at 200-01; *see, e.g., Domingo*, 257 S.W.3d at 39 (listing, among elements of breach of contract claim, "performance or tendered performance by the plaintiff"). In *Perry*, the defendant agreed to purchase shares of corporate stock at a stated price on a stated date. *Id.* at 199. In the suit that resulted from his failure to buy the stock, he defended in part by asserting the plaintiff never made a formal tender of the shares. *Id.* at 199-200. Reversing the court of appeals, the supreme court held that a formal tender was not necessary. Quoting Williston on Contracts, the court said that in cases of such concurrent conditions, "what is essential is that it shall appear to the court and shall have been made clear to the other party to the contract that the exchange agreed upon would be carried out immediately if the latter would do his part. This requirement involves both ability on the part of the plaintiff to perform and an indication of that ability to the other party." *Id.* at 200.

The trial court found that G&T was "ready, willing and able" to close on November 4, and on November 15, 2011. During his testimony Greg Hodnett agreed that G&T was

"ready, willing and able to close" on November 4, 2011, "had [they] been told to do it."[8] Bradshaw asserts such a conclusory statement is insufficient to establish G&T's readiness to close.

There is other evidence supporting the court's finding. In August 2011, G&T contracted to buy some 4,872 acres of land in Swisher County, Texas, at a price exceeding $3.5 million. The contract contained a closing date of November 10, 2011. Todd Hodnett testified G&T scheduled the Swisher County closing for November 10 because its contract with Bradshaw contained a November 4 closing date. He testified G&T was unable to close the Swisher County purchase because of Bradshaw's failure to complete his purchase of G&T's Hartley County land, and G&T forfeited the $150,000 earnest money it had deposited. That G&T had thus committed to pay over $3.5 million of its anticipated $4.2 million receipts from the Bradshaw sale in a transaction contracted to close on November 10 supports Greg Hodnett's statement that G&T was ready, willing and able to close with Bradshaw.

In his brief, Bradshaw points out the record does not contain a deed prepared for G&T's execution. While no proposed deed is in evidence, other documents prepared in anticipation of G&T's sale to Bradshaw are present. The evidence contains documents between G&T and the qualified intermediary with which it had contracted for the handling of the Bradshaw sale proceeds under the like-kind exchange provisions of Internal Revenue Code section 1031. The documents had been executed by the intermediary.

---

[8] It is undisputed that neither the title company nor either party actually scheduled a closing.

The evidence also contains an updated title insurance commitment, faxed by the title company to Bradshaw's attorney on November 10. The commitment states it was issued on July 15, updated on October 25 and again updated on November 10. There is evidence that Bradshaw raised no objections to the land's title.

Foster's testimony further indicates G&T was prepared to close its sale to Bradshaw. With regard to the closing, he told the court "we never had a problem with G&T getting that closed . . . ." Greg Hodnett, asked if G&T ever went to the title company "to try to close your side of the transaction," replied in the negative, and said Foster told the Hodnetts "there was not going to be a closing."

Contrary to Bradshaw's argument, we find the evidence supports the trial court's apparent conclusion that G&T's sale to Bradshaw would have closed on November 4 or November 15 if Bradshaw had done his part. *Perry*, 419 S.W.2d at 200. We turn, then, to consideration of the evidence that G&T's readiness to close was made clear to Bradshaw. *Id.* He contends in this Court there is no evidence G&T ever notified him of its readiness to close the sale before its November 23 termination letter. On this point also, we must disagree.

Bradshaw makes reference to an October 27, 2011 email from Foster to Bradshaw's attorney, in which Foster referred to some unfinished Meeks family probate work. Foster expressed his concern that Bradshaw "has a big problem fixing to happen." The email referred to his pending G&T purchase and to G&T's pending Swisher County purchase, and mentioned that Bradshaw might lose his earnest money. Bradshaw finds it important that the email states Bradshaw's G&T transaction was "to close by Nov. 15th." We are unable to see that the November 15 date helps Bradshaw here, however. For

14

our present purpose, we find the email significant because, almost a month before G&T's November 23 termination letter, Foster there expressed concern over Bradshaw's looming default. By reasonable implication, the email signifies Foster's sense that G&T would be prepared to meet its obligation to close. The record also contains Bradshaw's attorney's emailed response, sent on October 27 some twenty minutes after Foster's email. The response, with a copy to Bradshaw, states simply, "Working as fast as we can."

Foster also testified to his many telephone calls made to Bradshaw and his attorney, attempting to move them toward closing. Asked directly why the sale did not close on November 4, Foster pointed to his difficulties contacting Bradshaw's attorney. Asked later if he ever talked with Bradshaw about why he did not close the purchase, Foster told the court of a conversation in which Bradshaw said his wife did not want the land and believed their attorney could "get me off this contract." Foster testified he persisted with Bradshaw in that conversation, urging "you signed everything and we got to close." Bradshaw responded, Foster said, "I know; I wanted that farm." In his testimony, Bradshaw also said his wife "wasn't going along with [his] thinking" about the property.

Foster's communications with Bradshaw's attorney, the attorney's response, and Bradshaw's own testimony, coupled with the evidence of Bradshaw's exercise of control over the wheat crop he ordered to be planted and the preparation of the title commitment and other documents, provide evidence that Bradshaw possessed, well before the November 23 termination of the contract, an indication that G&T was both ready and able to close the transaction. *Perry*, 419 S.W.2d at 200. Because reasonable and fair-minded

15

people could reach the finding the trial court expressed, the evidence supporting the finding is sufficient. *City of Keller,* 168 S.W.3d at 827. Bradshaw's third issue is overruled.

Issue Four – Damages for Failure to Release Earnest Money

The trial court enforced Paragraph 18.D. of the contract and awarded G&T additional liquidated damages of three times the $420,000 earnest money, or $1,260,000. The court found that Bradshaw received "notice and/or demand" to release the earnest money on three occasions, in December 2011, January 2012 and December 2012.

In a 2013 opinion, the First Court of Appeals held the TREC contract form provision for liquidated damages of three times the earnest money for breach of the obligation to release the earnest money is an unlawful penalty. *Magill v. Watson*, 409 S.W.3d 673, 681 (Tex. App.—Houston [1st Dist.] 2013, no pet.). Bradshaw argues we should apply the First Court's holding in this case.

In *Magill*, the defendants failed to complete their purchase of real estate, and did not comply with the plaintiffs' demand that they authorize release of the earnest money. *Id.* at 676. In their suit, the trial court awarded the plaintiffs damages totaling $32,000, comprising the $8000 earnest money plus three times that amount, based on paragraph 18.D. of the parties' TREC-form contract, which contained language like paragraph 18.D. of the contract before us. In response to the defendants' contention the treble-damages provision was an unlawful penalty, the plaintiffs argued they suffered damages of $80,000 as a result of selling the property for a lower price after the defendants defaulted. *Id.* at 680-81.

16

The First Court agreed that the liquidated damages provision was void on its face as an unlawful penalty, noting the plaintiffs' claimed actual damages were caused by the defendants' failure to close on the transaction, not the failure to release the earnest money. *Id.*

Based on the Hodnetts' testimony, the trial court found Bradshaw's failure to close caused G&T to forfeit the earnest money it deposited in Swisher County. The court found also that G&T was to receive the benefit of a wheat crop growing on the Swisher County land, a crop insured for "around $500,000." These losses, like those in *Magill*, *id.*, were the result of Bradshaw's failure to close the Hartley County purchase, not a result of a failure to authorize the release of the earnest money to G&T. There is no suggestion G&T would have been able to complete the Swisher County purchase even had it received Bradshaw's earnest money promptly after its termination letter on November 23.

Finding the circumstances before us are similar to those in *Magill, id.*, and finding no reason for a holding different from that of the First Court of Appeals, we conclude paragraph 18.D. imposed an unlawful penalty on Bradshaw. *See also Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (distinguishing penalty from enforceable liquidated damages). His issue four is sustained.

Issue Five – Prejudgment Interest

Through his fifth issue, Bradshaw argues the award of prejudgment interest on the $1,200,000 additional liquidated damages was improper. Having sustained his fourth issue, we sustain this contention also.

17

Issue Six – Disposition of Earnest Money

Bradshaw asserts he is entitled to the return of his earnest money, based on his contentions he had no enforceable contract with G&T and even if so, he was not in default. We have concluded, to the contrary, that the parties had an enforceable contract, and that the court's finding Bradshaw defaulted is supported by sufficient evidence. Accordingly, his sixth issue is overruled.

Issue Seven – Attorney's Fees

Under the TREC contract's language, a buyer, seller, broker or listing agent "who prevails in any legal proceeding related to this contract is entitled to recover reasonable attorney's fees and all costs of such proceeding." The court awarded fees to G&T's attorneys, and the attorney representing Foster. Bradshaw's final issue challenges both awards. His argument reads:

> Because the trial court's judgment in favor of G&T and Foster should properly be reversed on the grounds stated in this brief, the trial court's award of attorney fees to G&T and Foster, based on their status as "prevailing parties," under the alleged contract should also be reversed. Finally, it is unconscionable to award attorney's fees to land broker Foster after he willfully misappropriated Bradshaw's earnest money as his personal petty cash fund in violation of his fiduciary duty as escrow agent.

We read Bradshaw's argument concerning G&T's attorney's fees to be based on his prior contentions that there was no enforceable contract between the parties and, even if there were a contract, no evidence of his default. Under our disposition of Bradshaw's first six issues, G&T is properly viewed as a prevailing party. *See*

18

*Intercontinental Group P'ship v. KB Home Lone Star L.P.,* 295 S.W.3d 650, 654-65 (Tex. 2009) (addressing meaning of "prevailing party" under contract language).[9]

As to Bradshaw's contention the award of attorney's fees to Foster is unconscionable, we note Bradshaw pled a cross-complaint asserting Foster breached fiduciary and contractual duties he owed Bradshaw. Bradshaw presented expert witness testimony critical of Foster's handling of his role as broker and of his handling of the earnest money. But the court made no findings that Foster failed to perform duties he owed Bradshaw and its judgment states it "denied" claims Bradshaw asserted. Other than his complaint over the award of attorney's fees to Foster, Bradshaw raises no issue on appeal challenging the trial court's treatment of his claims against Foster. Nor does Bradshaw present a contention Foster did not prevail over Bradshaw's claims against him, or that the claims were not related to the contract. *See Fitzgerald v. Schroeder Ventures II, LLC*, 345 S.W.3d 624 (Tex. App.—San Antonio 2011, no pet.) (addressing such claims under real estate contract, finding successful defendants entitled to fees). For those reasons, we overrule Bradshaw's challenge to the attorney's fees awarded G&T and Foster.

Conclusion

Because the provision of section 18.D. of the contract providing for liquidated damages of three times the amount of the earnest money imposed an unlawful penalty,

---

[9] Bradshaw does not raise on appeal a challenge to the sufficiency of the evidence supporting the amount of attorney's fees the trial court awarded G&T, so we do not address the question whether the amount of the fees should be reduced because of the reduced recovery our judgment will affirm. *See Young v. Qualls*, 223 S.W.3d 312, 314 (Tex. 2007) (per curiam); *Barker v. Eckman*, 213 S.W.3d 306, 312 (Tex. 2006).

19

we find the trial court erred by awarding damages of three times the earnest money. We accordingly reverse the portion of the trial court's judgment awarding G&T damages against Bradshaw in the amount of $1,260,000, and render judgment G&T take nothing on its claim for three times the earnest money. For the same reason, we modify the portion of the trial court's judgment that awarded pre-judgment interest in the amount of $317,946.58 and render judgment for G&T against Bradshaw for pre-judgment interest in the amount of $56,182.19, calculated at 5% on the sum of $270,000[10] from February 17, 2012 to the date of the trial court's judgment. We also modify the portion of the trial court's judgment that awarded post-judgment interest, and render judgment for G&T against Bradshaw for post-judgment interest, calculated at 5% on the sum of $112,341.19, beginning on the date of the trial court's judgment and continuing until the judgment is paid in full. We affirm all other portions of the trial court's judgment.

James T. Campbell
Justice

Pirtle, J., concurring.

---

[10] The record shows the remaining $150,000 of the earnest money was disbursed before suit was filed.

20